## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| **VALADOR, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-1162** |
| | ) | |
| **HTC CORPORATION,** *et al.*, | ) | |
| **Defendants.** | ) | |
| | ) | |

### MEMORANDUM OPINION

At issue in this trademark infringement and cybersquatting case is the parties' use of the term, "VIVE," in connection with their respective products or services. Plaintiff, Valador, Inc., alleges that each defendant, HTC Corporation, HTC America, Inc., and Valve Corporation, has infringed on plaintiff's VIVE mark through defendants' alleged marketing, advertising, and selling of a headset, the "HTC Vive," a hardware device capable of running software that renders three-dimensional images. Plaintiff further contends that HTC Corporation's use of website domain names containing the word, "VIVE," constitutes unlawful cybersquatting. The parties have filed cross motions for summary judgment on the following remaining Counts[1]:

- Count I: Trademark infringement, in violation of 15 U.S.C. § 1114(1)(a), against *all* defendants.

- Count II: Unfair competition and false designation of origin, in violation of 15 U.S.C. § 1125(a), against *all* defendants.

- Count III: Cybersquatting, in violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), against defendant *HTC Corporation*.

---

[1] The SAC originally included five Counts, two of which—common law conspiracy and Virginia statutory conspiracy—were dismissed against all defendants pursuant to Rule 12(b)(6), Fed. R. Civ. P. *See Valador v. HTC Corp.*, No. 1:16-cv-1162 (E.D. Va. Jan. 13, 2017) (Order). Count III—cybersquatting—was similarly dismissed against defendants HTC America and Valve. *Id.*

As the matter has been fully briefed and argued orally, it is now ripe for disposition.

## I.

Listed below are the undisputed material facts derived from the parties' statements of undisputed facts submitted in support of their summary judgment motions, and additional undisputed facts gleaned from the summary judgment record.[2]

- Plaintiff, Valador, Inc., is a small, services business built on the use of technology.

- On December 25, 2007, the U.S. Patent and Trademark Office ("PTO") granted plaintiff's application for a registered trademark and service mark in the standard character mark "VIVE" in International Classes 009 and 035.

- Plaintiff's registered mark is an acronym for "Valador Immersive Visual Environment."[3]

- Plaintiff's "VIVE" mark falls within International Class 009 as "computer software applications for three dimensional (3D) presentation of information and event simulation." Plaintiff's mark also falls within International Class 035 for "[b]usiness consulting services in the fields of information management and analysis through three dimensional (3D) computer modeling techniques."

- Defendant HTC Corporation is a Taiwanese company that designed, manufactures, and sells a product—a headset—labeled "HTC Vive." The HTC Vive headset is available for purchase by the general public worldwide through physical retail outlets and online.

---

[2] Omitted from the list of undisputed facts are two categories of facts submitted by plaintiff. The first is plaintiff's expert report regarding likelihood of trademark confusion, which report has been excluded as unreliable pursuant to Rule 702, Fed. R. Evid. The second is plaintiff's evidence regarding any actual or potential development plans, advertising, promotions, offers for sale, or sales of headsets or other virtual reality hardware, which evidence the Magistrate Judge properly excluded given plaintiff's violation of the discovery rules. Indeed, plaintiff's objection to that Magistrate Judge's Order has been overruled. *See Valador v. HTC Corp.*, No. 1:16-cv1162 (E.D. Va. Mar. 3, 2017) (Order).

[3] The parties dispute whether plaintiff's mark has reached "incontestable status" under 15 U.S.C. § 1065. This dispute need not be addressed here, because the undisputed factual record discloses no likelihood of confusion. *See Petro Stopping Ctrs. L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 92 (4th Cir. 1997) ("[I]ncontestability affects the validity of the trademark but does not establish the likelihood of confusion necessary to warrant protection from infringement."); *Synergistic Int'l, LLC v. Korman,* 470 F.3d 162, 170 (4th Cir. 2006) (observing that a mark's incontestability "does not, in and of itself, establish the statutory requirement of likelihood of confusion").

- The HTC Vive headset is a hardware device that includes hand controls and is capable of running virtual reality games and entertainment software.

- Defendant HTC America is responsible for advertising, marketing, and promoting the HTC Vive headset in the U.S.

- Defendant Valve is a software company that does not sell the HTC Vive headset, but instead provides free software that can be downloaded to an HTC Vive headset and other similar hardware.

- Plaintiff has four main lines of business: (1) modeling and simulation, (2) information assurance, (3) management consulting, and (4) software engineering.

- Plaintiff provides these services pursuant to government contracts as either a prime contractor or a sub-contractor. In fact, Plaintiff's Chief Financial Officer, Philip Hamilton, stated that plaintiff performs 100% of its work through these means.

- Plaintiff derives its annual revenue almost exclusively from government contracts with two federal agencies: NASA and the Department of Veteran's Affairs. Approximately 99% of plaintiff's work is for government clients.[4]

- Plaintiff's government agency clients are sophisticated entities that make purchasing decisions based upon detailed proposals that are subject to competitive bidding.

- Plaintiff's 2016 revenue was approximately ▮▮▮▮▮, with roughly ▮▮▮▮▮ in profit.

- Notably, the undisputed factual record discloses that plaintiff's "VIVE"—i.e., the Valador Immersive Visual Environment—is not itself a physical product, game, service, or stand-alone software. Rather, plaintiff's "VIVE" is a "development environment used by Valador to develop applications." Mabie Depo. at 97. In other words, plaintiff's VIVE

---

[4] Plaintiff has not successfully disputed this fact. In attempting to identify a factual dispute, plaintiff cited to deposition testimony (1) that in approximately 2011, plaintiff performed work for a commercial entity, Lockheed Martin, and (2) that plaintiff recently performed work for the West Virginia High Technology Consortium Foundation. Plaintiff's 2011 contract with Lockheed is inapposite because plaintiff has not performed any contract with Lockheed in over five years. And plaintiff's work for the West Virginia High Technology Consortium Foundation is immaterial because that work generated less than 1% of plaintiff's revenue for 2016. In addition, plaintiff's CEO conceded that he could not remember the names of any other commercial client in 2016, and that any job plaintiff did for a commercial client in 2016 was fairly small and likely to have lasted no more than one day. *See* Mabie Depo. at 220-23; 271.

"is a means for developing solutions to a problem" and "a theory for doing collaboration," which includes some software. McHenry Depo. at 178-79.[5]

- According to plaintiff's CEO, plaintiff's "VIVE" includes "custom applications that [plaintiff] developed, open source documents, [and] open source applications that [plaintiff has] strung together into a development environment that [plaintiff] use[s]" to develop further applications. Mabie Depo. at 75:10-15.

- Plaintiff does not sell its VIVE process or environment "separately from the application or the end product" it delivers to clients. Mabie Depo. at 79:6-16. Rather, the end products plaintiff delivers to its clients—namely, NASA and the Department of Veterans Affairs—are software programs that render three-dimensional simulation results, which plaintiff's customers may then use.

- None of plaintiff's deliverables is labeled or branded with plaintiff's "VIVE" mark.

- None of the applications plaintiff constructs using its VIVE process is called "VIVE" or labeled "VIVE."

- Plaintiff occasionally used its "VIVE" mark in contracts with government agencies to connote that plaintiff would use its VIVE process or environment in performing the contract.

- The contract prices for which plaintiff alleges to have used its VIVE process range from $99,550 into the tens of millions of dollars.

- Plaintiff has no registered trademark rights related to any hardware.

- Plaintiff has not received any awards related specifically to its VIVE process, and plaintiff's VIVE has not received press coverage beyond plaintiff's own press releases and a single third-party blog post.

- In 2010, plaintiff, pursuant to a contract with defendant Valve, used Valve's software tools to create two maps, labeled "Moundsville Slammer," for a video game,

---

[5] In its brief and at oral argument, plaintiff purported to dispute this fact, asserting that plaintiff's VIVE is itself a software product sold to customers. But plaintiff did not cite to any record evidence supporting this proposition. In fact, plaintiff's assertion at oral argument directly contradicts the testimony of Mr. Mabie himself, who testified that plaintiff's VIVE is an "environment" used to develop applications. See Mabie Depo. at 97. Plaintiff's Chief Financial Officer, Emmitt McHenry, also described plaintiff's VIVE as an "environment" and "a theory of doing collaboration," in contradistinction to standalone software. McHenry Depo. at 176-78. Plaintiff's senior software engineer, Philip Stroh, similarly testified that plaintiff's VIVE is "a means for developing solutions to problems" and a "tool[] that facilitates[s] the pipeline of building ... 3-D simulations[.]" Stroh Depo. at 76-77.

"Left4Dead" and its sequel, "Left4Dead2." These maps have been downloaded approximately 43,000 times over the past six years.

- These two video game maps are not standalone products, and they are not branded or labeled with plaintiff's "VIVE" mark.

- Plaintiff did not intend to sell its "Moundsville Slammer" maps. In fact, plaintiff's contract with Valve prohibited plaintiff from using those maps for any commercial purpose.

- According to plaintiff's CFO, plaintiff does not have a video game division within the company.

- Plaintiff's senior software engineer, Mr. Stroh, confirmed that plaintiff is not currently working on any projects regarding video games, campaigns, or maps. ▬▬▬▬▬▬ ▬▬▬▬▬ the company ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

- Although plaintiff, on October 27, 2015, investigated engaging in further video game work and generated an internal proposal concerning a room-capture application, this proposal was considered for only 10 days and then abandoned. Plaintiff did not revisit that proposal.

- Plaintiff maintains a website at "www.valador.com." Before this litigation, that website did not display the word "VIVE" on its main page.

- After plaintiff filed its lawsuit, plaintiff altered its website to feature prominently the unstylized, hyperlinked word "VIVE" on the main page. When clicked, the hyperlink redirects to a subpage about plaintiff's VIVE development environment.

- Plaintiff does not maintain a webstore where potential consumers can purchase any goods or services.

- Plaintiff does not sell any goods or services through third party retailers.

- Plaintiff has not incurred any cost in creating its "VIVE" mark.

- Over the last three years, plaintiff has spent ▬▬▬▬▬ in advertising, marketing, and promotional spend for all of its services.

- Plaintiff contends that it marketed its VIVE environment or process at trade shows. Yet, plaintiff produced ten photos from such trade shows, none of which displays plaintiff's VIVE environment or process.

- Moreover, plaintiff's promotional materials for its VIVE environment comprise dense textual descriptions directed to government agencies in need of consulting services.

5

- In January 2015, HTC Corporation selected the "VIVE" name for its headset, the HTC Vive.

- HTC Corporation selected the "VIVE" name independently and without any knowledge of plaintiff.

- HTC Corporation originally conceived the name of its product as "Re Vive" before changing it to "HTC Vive."

- On March 1, 2015, HTC introduced the HTC Vive headset. The event was covered by mainstream and web-based media in the U.S. and around the world.

- On April 9, 2015, HTC Corporation filed trademark applications with the PTO for "Vive," "HTC Vive," and "HTC Re Vive" for, *inter alia*, software.

- Subsequently, plaintiff filed of a letter of protest with the PTO.

- After plaintiff filed its letter of protest, HTC Corporation narrowed the description of goods contained in its trademark application to hardware.

- HTC Corporation, through outside trademark counsel, also contacted plaintiff's counsel regarding a short co-existence agreement. In those communications,[6] defendants' counsel emphasized that the parties' products and services were distinguishable.

- Thereafter, on January 18, 2017, the PTO determined that HTC Corporation's applications related to virtual reality hardware did not pose a likelihood of confusion with any existing registered trademarks and cleared the applications for publication by February 28, 2017.

- In this respect, the PTO provisionally granted HTC Corporation's trademark applications for hardware in the same classes as plaintiff's "VIVE" mark.

- HTC Corporation followed its standard corporate practice in performing a trademark search with the assistance of outside counsel after selecting, but before using, the "HTC Vive" name.

- The mark, "VIVE," or its variants is currently registered for use by more than 64 companies. Some 36 companies use the mark in the same markets that plaintiff purports to serve, and at least nine are registered in International Class 009 or 035.

---

[6] Plaintiff contends that it sent HTC Corporation and HTC America's counsel a cease and desist letter regarding defendants' use of the "VIVE" mark. Yet, the HTC defendants have identified evidence indicating that their counsel never received such a letter. It is unnecessary to resolve this factual dispute, as it is immaterial to the resolution of the summary judgment motions.

- At least 20 mobile software applications are called "VIVE" (or a phonetic equivalent or a combination mark that includes "VIVE").

- Plaintiff is one of seven entities that have trademark registrations for, and use, "VIVE" marks in the software category.

- The word, "VIVE," as used by HTC, almost universally appears either immediately preceded by the word "HTC," which has its own unique branding, or accompanied by both the stylized "HTC" and "SteamVR" trademarks.

- Since 2015, HTC Corporation and HTC America have engaged in a varied and extensive advertising and promotional campaign in the U.S. for the HTC Vive headset, costing the HTC defendants approximately ███████████

- This advertising includes (1) attendance at trade shows, conferences, and music festivals, (2) signs and demonstrations at brick-and-mortar retail locations, (3) a mobile demonstration unit housed in an HTC-branded tractor-trailer that toured the U.S. for approximately six months, and (4) digital advertising through Google AdSense, Facebook, and Twitter.

- HTC Corporation owns and operates the domain names "www.htcvive.com," "www.vive.com," and "viveport.com."

- Plaintiff never registered a domain name containing the word "VIVE."

- HTC Corporation has made no attempt to sell any domain name to plaintiff. Nor has HTC Corporation sought remuneration of any kind from plaintiff in exchange for any domain name.

- A webstore is available through "www.vive.com," allowing customers to purchase the HTC Vive headset directly.

- The HTC Vive headset is also available for purchase from third party retailers, both at the retailers' physical locations and online stores.

- The HTC Vive headset sells for $799.

- A business edition of the HTC Vive headset is available only by direct inquiry to HTC. This product, the "HTC ViveBE," comes with extended cabling and a longer warranty, and sells for $1,200.

- Consumers of the HTC Vive headset, and virtual reality products in general, are sophisticated purchasers who generally consider the differences in the various virtual reality products available.

- Defendant Valve has not received any revenue from sales of the HTC Vive headset.

- The HTC defendants own the trademark rights in the word mark, "VIVE," in several other countries.

## II.

Where, as here, the parties have filed cross motions for summary judgment, each motion must be reviewed "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted). In this respect, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). No triable issue exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted). Once the movant meets its burden, the opposing party, in order to defeat the motion, must set forth specific facts showing a genuine issue for trial. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). In this respect, "a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits," and thus the inquiry is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Importantly, on a summary judgment motion, "the facts, with reasonable inferences drawn," are viewed "in the light most favorable" to the non-moving party. *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

## III.

Summary judgment must be awarded to defendants on all remaining Counts. Defendants are entitled to summary judgment on plaintiff's Lanham Act claims because no reasonable juror could find a likelihood of confusion as to the source of the parties' marks, goods, or services; simply put, plaintiff and defendants sell dissimilar things through different channels in disparate markets. Similarly, plaintiff's cybersquatting claim fails because no reasonable jury could conclude that HTC Corporation acted with a bad faith intent to profit from plaintiff's mark.

### A. Counts I and II: Trademark Infringement and Unfair Competition

The operative complaint alleges that all three defendants (1) committed trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114, and (2) engaged in unfair competition, in violation of § 1125(a).[7] To prevail on its infringement and unfair competition claims, plaintiff must prove "that it had a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006) (brackets omitted). Of course, the touchstone of a trademark infringement claim is whether "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)). Put differently, courts "look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.* Here,

---

[7] Because the elements for both of these claims are essentially the same, these two Counts may be considered together. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 n. 5 (4th Cir. 2002) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same[.]").

defendants are entitled to summary judgment because, "based on the undisputed facts in the summary judgment record, no reasonable jury could find a likelihood of confusion[.]" *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 699 (E.D. Va. 2005) (finding no confusion between companies using the "Renaissance" mark on gift bags given (1) "[t]he common and frequent use of the ... mark" by others, (2) plaintiff's "de minimis share of the retail market and paltry advertising efforts," (3) the "absence of any evidence of [defendant]'s intent to confuse, and (4) the de minimis evidence of actual consumer confusion), *aff'd*, 227 F. App'x 239 (4th Cir. 2007).

Courts have recognized two forms of confusion in trademark infringement cases: "forward" confusion and "reverse" confusion.[8] The traditional pattern of forward confusion occurs "when customers mistakenly think that the junior user's goods or services are from the same source as or connected with the senior user's goods or services." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed. 2017). Applied here, a forward confusion theory would mean that consumers mistakenly believe that the HTC Vive headset is associated with plaintiff. By contrast, in a reverse confusion case, the junior user overwhelms the market such that "customers purchase the senior user's goods under the mistaken impression that they

---

[8] The Fourth Circuit has not explicitly adopted the reverse confusion theory. *See Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165, *12 (4th Cir. 1999) (Table Decision) ("To date, this Court has not adopted the doctrine of reverse confusion."). Nonetheless, the Fourth Circuit has cited the theory favorably. *See Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 347 (4th Cir. 2001) (describing the facts presented as "a classic case of 'reverse confusion'"). In addition, the PTO and district courts in this circuit have applied the reversion confusion theory. *See, e.g.*, *In re Shell Oil Co.*, 992 F.2d 1204 (Fed. Cir. 1993); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468 (D. Md. 2012); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D.N.C. 2009). Because plaintiff has invoked the reverse confusion theory, analysis proceeds assuming the validity of a reverse confusion claim.

are getting the goods of the junior user." *Id.*[9] Here, reverse confusion would occur if someone purchasing plaintiff's goods or services was under the mistaken impression that they were buying an HTC Vive headset. *See id.* Thus, to prove likelihood of confusion under a reverse confusion theory, plaintiff must show "that because of the similar marks, [plaintiff]'s customers are likely [and mistakenly] to … think that [HTC] is the source of, or is sponsoring or backing, [plaintiff]'s goods or services." *Id.* Although plaintiff has not unequivocally chosen a theory, plaintiff's counsel at the summary judgment hearing relied exclusively on reverse confusion.[10]

Ultimately, this circuit recognizes nine factors that may guide the likelihood-of-confusion inquiry:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*George*, 575 F.3d at 393. Not all nine factors are "of equal importance, nor are they always relevant in any given case." *Id.* (quotation marks omitted).

For the reasons that follow, the undisputed factual record discloses that no reasonable juror could find a likelihood of either forward confusion or reverse confusion. In short, the parties use their relatively weak "VIVE" marks in different ways in disparate markets to promote dissimilar products.

---

[9] In a reverse confusion trademark case, "[t]he public comes to assume the senior user's products are really the junior users or that the former has become somehow connected to the latter." *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987). In this respect, the senior user "loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.*

[10] *See Valador, Inc. v. HTC Corp.*, No. 1:16-cv-1162 (E.D. Va. Mar. 3, 2017) (Hr'g Tr.) at 5:22–6:2; 6:18–21; 55:22–25.

**(1) The Strength or Distinctiveness of the Marks as Used in the Marketplace.**

Under either a forward confusion or reverse confusion theory of trademark infringement, this first factor does not favor plaintiff. Typically, in a forward confusion case, this first factor evaluates "the strength or distinctiveness of the *plaintiff's* mark as actually used in the marketplace." *George*, 575 F.3d at 393 (emphasis added). Importantly, however, the analysis in a reverse confusion case focuses on the *defendant's* mark. Where the plaintiff has claimed reverse confusion, "there is no reason to apply the standard requirement that the senior user have a strong enough mark that confusion will result," because the junior user in a reverse confusion case "is not trying to take a free ride on the recognition value of a strong, senior mark[.]" 4 McCarthy on Trademarks § 23:10. Thus, in a reverse confusion case, "it makes more sense to evaluate whether persons familiar with the junior user's stronger mark, and who encounter the senior user's weaker and less well-known mark, associate it with the junior user's mark." *Id.* Generally, "the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *Id.*

There are two aspects to a mark's strength: (1) conceptual strength, i.e., the placement of the mark along a spectrum focusing on the inherent potential distinctiveness of the term; and (2) commercial strength, i.e., the marketplace's recognition as of the time the mark is asserted in litigation. *See George*, 575 F.3d at 393. Commercial strength is the more important aspect, because "a conceptually strong mark that is relatively unknown in the marketplace will not be likely to cause any confusion among consumers of other products." *Renaissance*, 405 F. Supp. 2d at 690.[11]

---

[11] *See also* 2 McCarthy on Trademarks § 11:83 ("Many arbitrary and suggestive terms may be conceptually and inherently strong, but if they receive little publicity through only meager

Neither aspect weighs in plaintiff's favor with regard to a likelihood of confusion. To begin with, the parties' "VIVE" marks are conceptually weak. A mark's *conceptual* strength falls into one of four classifications along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See George*, 575 F.3d at 394. Normally, the PTO's registering of a trademark is *prima facie* evidence of that mark's conceptual strength because the PTO registers only fanciful, arbitrary or suggestive marks, or descriptive marks shown to have acquired secondary meaning. *Id.* at 395. Yet, the conceptual strength of a commonly-used mark decreases as the number of third-party registrations increases.[12] In this respect, "[a] strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (finding no likelihood of confusion between the parties' "First Care" and "CareFirst" marks). The Fourth Circuit has also expressed doubt whether an abbreviation that merely describes the underlying product can be anything more than descriptive. *See George*, 575 F.3d at 395 n.12 (noting that the abbreviation "LCR" for "Left Center Right" is likely "a descriptive term").

Here, the "VIVE" mark is conceptually weak. This is so because the undisputed factual record reflects (1) that the PTO has registered the mark "VIVE" or its variants for use by more than 64 companies, (2) that at least 36 companies use the "VIVE" mark in the same markets that plaintiff claims to serve, (3) that at least nine of those marks are registered in the same

---

advertising and feeble sales, they are relatively weak marks in the place where it counts: the marketplace.").

[12] *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1531 (4th Cir. 1984) ("The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion." (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259-60 (5th Cir. 1980) (holding that 72 third-party registrations of the appellant's DOMINO mark made the mark weak)).

international class as plaintiff's mark, and (4) that there are 20 mobile software applications called "VIVE" (or a phonetic equivalent or combination mark). *See CareFirst*, 434 F.3d at 270 (holding that a mark was conceptually weak where "dozens" of "health-care-related businesses" actively used the same mark used by plaintiff's healthcare company). And, like the plaintiff in *George*, plaintiff's "VIVE" mark is a descriptive acronym and thus not particularly strong— indeed, it is undisputed that plaintiff's mark, "VIVE," is an acronym for "Valador Immersive Visualization Environment." *See George*, 575 F.3d at 395 n.12 (doubting whether the abbreviation "LCR" for "Left Center Right" could be suggestive). Simply put, because dozens of companies use the "VIVE" mark (or its variants) across a variety of markets, including the market plaintiff purports to serve, the "VIVE" marks at issue here are conceptually weak.

Regarding the second aspect, *commercial* strength, plaintiff's "VIVE" mark is weak, whereas HTC Corporation's mark is somewhat stronger. To determine a mark's commercial strength, courts "look[] at the marketplace and ask[] if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or enterprise." *CareFirst*, 434 F.3d at 269. This analysis typically includes consideration of "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *George*, 575 F.3d at 396.[13]

These factors demonstrate that plaintiff's mark is commercially weak. In this respect, the undisputed record evidence showing widespread use of "VIVE"—a telltale sign of conceptual weakness—also undermines the mark's *commercial* strength. *See CareFirst*, 434 F.3d at 269

---

[13] In this respect, analysis of a mark's commercial strength is "similar to the 'secondary meaning' inquiry considered in evaluating a mark's validity." *George*, 575 F.3d at 395.

("Th[e] evidence of extensive third-party use also demonstrates that [plaintiff]'s mark lacks commercial strength...."). Similarly, plaintiff has spent relatively little on marketing or advertising for its mark. Nor has plaintiff even attempted to provide a consumer study linking plaintiff's mark to any source. And although plaintiff has enjoyed millions of dollars in sales success relating to contract work, plaintiff does not sell the "VIVE" process as a standalone product; rather, plaintiff simply occasionally identifies its mark in government contracts. In addition, the undisputed factual record discloses that plaintiff's mark has not received any press coverage beyond plaintiff's own press releases and a single third-party blog post. Nor is there any evidence that anyone attempted to copy or plagiarize plaintiff's mark; instead, the uncontroverted evidence reflects that dozens of companies have independently created and registered a "VIVE" mark similar to plaintiff's. In sum, these factors indicate that plaintiff's mark is commercially weak. *See George*, 575 F.3d at 396 (finding a mark was commercially weak notwithstanding plaintiffs' 20 years of using its mark and recent sales success). And here, as in *George*, "the record is devoid of meaningful evidence demonstrating that consumers associate the [plaintiff's] mark with [plaintiff]." *Id.*

HTC Corporation's "VIVE" mark, however, is somewhat stronger. This is so because the HTC defendants have expended approximately ▮▮▮▮▮▮ in advertising and appear to have enjoyed sales success and unsolicited media coverage. Nevertheless, it is undisputed that the HTC defendants have used the mark for fewer than two years, and there are no consumer studies in this record linking defendants' mark to a source, nor any evidence regarding attempts to plagiarize HTC Corporation's mark. Thus, although HTC Corporation's mark is commercially stronger than is plaintiff's, neither mark is a heavyweight—that is, neither mark merits being labeled commercially "strong."

Given this, the undisputed factual record points convincingly to the conclusion that the "VIVE" marks here are conceptually weak. Plaintiff's mark is commercially weak, whereas the HTC Corporation's mark is stronger commercially, albeit only modestly so. Therefore this first factor in the likelihood-of-confusion analysis—the mark's conceptual and commercial strength—does not militate in favor of finding a likelihood of confusion.

**(2) The Similarity of the Two Marks to Consumers**

This factor favors defendants. Although the parties' marks both include the same term, "VIVE," the similarities end with the text. Importantly, the "similarity" factor "focus[es] on whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George*, 575 F.3d at 396; *see also CareFirst*, 434 F.3d at 271 ("To determine whether two marks are similar, we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." (quotation marks omitted)). Therefore, "[m]ere use of a mark that is similar or even identical to a registered trademark does not *a fortiori* establish infringement." *What-a-Burger of Va. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 450 (4th Cir. 2004).[14] In this respect, "[a]n informed analysis of whether the likelihood of confusion exists cannot rest solely upon a 'side-by-side' comparison of the marks without regard to the marketplace in which they are used." *Id.* If textually similar marks are "commonly paired with other material, that pairing will ... lessen any confusion that might otherwise be caused by the textual similarity between the two marks." *CareFirst*, 434 F.3d at 271 (holding that the "Care First" and "First Care" marks were not similar despite their texts because one mark "[wa]s almost always paired

---

[14] *See also Petro Stopping Ctrs. L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (noting that courts should focus on "similarity in appearance and sound which would result in confusion" rather than "confine their scrutiny merely to similarities . . . [b]ecause every triable case of trademark infringement involves marks that are similar at some level[.]").

with the Blue Cross Blue Shield language, while the [other] mark is always presented by itself, or at most with the suffix 'P.C.'").

These principles demonstrate that the second likelihood-of-confusion factor weighs against finding a likelihood of confusion. To be sure, the two marks here are textually similar—both use the term, "VIVE." But textual similarity alone is insufficient. *See id.* (a comparison of similar or identical text "is insufficient if the marks have different appearances in the marketplace").[15] Notably, plaintiff relies exclusively on a comparison of the *texts* of the two marks, but plaintiff does not—and cannot—contest that the marks have different appearances in the marketplace. In this respect, the undisputed record evidence reflects that plaintiff almost never stylizes its mark, and when it does, plaintiff uses its company logo, which does not resemble any of defendants' logos. Contrast plaintiff's plain "VIVE" mark with the undisputed evidence that HTC Corporation's "VIVE" mark almost always appears next to defendants' stylized "HTC" and "SteamVR" trademarks and a neon blue triangle. Here, as in *CareFirst*, the marks at issue have different appearances in the marketplace. *See id.*

Thus, despite the textual similarity of the two "VIVE" marks, this factor weighs decisively in defendants' favor and against a finding of likelihood of confusion.

### (3) The Similarity of the Goods or Services that the Marks Identify

Like the second likelihood-of-confusion factor, this third factor severely undermines plaintiff's Lanham Act claims. This is so for the simple reason that the parties' marks identify strikingly different goods or services in different markets.

---

[15] *See also George*, 575 F.3d at 396 (holding that two producers of the same board-game did not have similar marks, despite using "LCR" and "Left Center Right," respectively, because "the manner in which the marks are used on their respective packaging distinguishes the two marks").

Of course, the goods or services need not be identical for this factor to weigh in plaintiff's favor. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984). Indeed, "[w]hen the infringing goods are not identical to the goods sold under the trademark, [the latter] may still be entitled to protection if they are sufficiently related to cause consumers to believe they derive from the same source." *Renaissance*, 405 F. Supp. 2d 694. Nevertheless, "[t]he fact that a junior user's good is related to that of the senior user[] is not[] sufficient by itself to overcome a weak mark." *Id.* The Fourth Circuit has therefore concluded that using the mark, "ARROW," even "in the related fields of beer and cordials," was insufficient to "indicate a common origin or endanger the reputation of the plaintiff's goods." *Arrow Distilleries, Inc. v. Globe Brewing Co.*, 117 F.2d 347, 351 (4th Cir. 1941). Similarly, the Fourth Circuit has found that a defendant's use of "PETRO" did not infringe on the plaintiff's "PETRO" mark even where both parties sold fuel. *See Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F. 3d 88, 95 (4th Cir. 1997).[16] And the Federal Circuit has concluded that where, as here, one mark represents a "service" and the other represents a "tangible good," textually identical marks are nonetheless dissimilar. *Shen Mfg. Co. v. Ritz Hotel Ltd.*, 393 F.3d 1238, 1245 (Fed. Cir. 2004) (holding that textually identical "RITZ" marks used in cooking classes and kitchen textiles were dissimilar).

The undisputed factual record here demonstrates that the parties' goods and services are not similar because they are offered in very different markets. In this respect, the HTC Vive headset is an entertainment device—namely, a headset and controllers—capable of running virtual reality *video games* and *entertainment* software. By contrast, plaintiff's "VIVE,"

---

[16] The leading McCarthy treatise is replete with similar examples where courts found no infringement, even where the parties used similar or identical trademarks for related goods. *See* 4 McCarthy on Trademarks § 24:62 (collecting cases).

18

according to plaintiff's officers, is a "theory for doing collaboration," and a "development environment"[17] that plaintiff uses in generating software applications pursuant to high-priced, competitively-selected contracts with sophisticated entities. *See Shen Mfg.*, 393 F.3d at 1245 (holding that textually identical marks were dissimilar where one party's product "[wa]s a service while the other['s] [wa]s a tangible good").[18] And as the undisputed factual record shows, plaintiff uses its "VIVE" environment to support its four lines of business: (1) modeling and simulation, (2) information assurance, (3) management consulting, and (4) software engineering. Thus, none of plaintiffs' products or services is similar to an entertainment device such as the HTC Vive headset.

The parties also have significantly different customer bases. The consumer base for the HTC Vive headset is individual consumers; in this respect, the HTC Vive headset retails at $799, with a $1,200 business edition of the HTC Vive headset available only by direct inquiry to HTC. By contrast, plaintiff uses its VIVE mark in providing consulting services and in performing large-scale contracts with sophisticated government agencies and artificial entities. Indeed, the undisputed factual record discloses that the contracts in which plaintiff used its VIVE process range from $99,550 into the tens of millions of dollars—a far reach from an HTC Vive customer's price point. Nor is there any evidence that the parties have similar business models.

---

[17] *See supra* note 5 and accompanying text.

[18] *See also CareFirst*, 434 F.3d at 272-74 (health plan provider and direct medical care provider services were not similar); *Petro Stopping*, 130 F.3d at 95 (no likelihood of confusion between fuel stations where both parties sold fuel, but defendant also offered multiple other services); *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 122 (D. Mass. 1999) (no likelihood of confusion between a game and computer consulting service); *Healthbox Global Partners, LLC v. Under Armour, Inc.*, No. 16-cv-146, 2016 WL 3919452, at *8, *10 (D. Del. July 19, 2016) (no likelihood of confusion in part because "plaintiff offers services to healthcare startups and businesses, whereas defendant offers a fitness product").

In opposition to this conclusion, plaintiff's counsel asserted during oral argument that plaintiff's "VIVE" is simply software that plaintiff delivers to its clients, and thus plaintiff's "VIVE" is similar to the entertainment software playable on an HTC Vive headset. This argument has no basis in the record because it contradicts plaintiff's own witnesses and because plaintiff does not provide its clients any product labeled with the "VIVE" mark. Rather, plaintiff's deliverables include, at most, software that plaintiff developed *using* its VIVE process. But plaintiff never branded those deliverables with the "VIVE" mark; rather, plaintiff only occasionally referenced "VIVE" in some of plaintiff's high-priced contracts. And there is nothing in the record indicating that, in signing those contracts, plaintiff's customers—namely, NASA and the Department of Veterans Affairs—sought or bought from plaintiff *entertainment* devices or software akin to an HTC Vive.

Yet plaintiff, in an attempt to bridge this chasm between the parties' disparate goods, services, and markets, also emphasized that in 2010 plaintiff developed some "Moundsville Slammer" video game maps for free download. This fact is of no moment in the analysis here; plaintiff's video game maps were not branded or labeled in any way with the "VIVE" mark. Nor did plaintiff ever sell these video game maps. Rather, plaintiff's contract with defendant Valve expressly prohibited plaintiff from using these video game maps for any commercial purpose.

Nor is the conclusion reached here affected by plaintiff's reverse confusion claim— namely, that plaintiff cannot move into the video game market in light of HTC Corporation's market saturation. According to plaintiff's CFO, plaintiff does not have a video game or entertainment division, and plaintiff's senior software engineer confirmed that plaintiff is not currently working on any projects that have to do with video games or campaigns or maps. This is unsurprising, given that at least 99% of plaintiff's business stems from contracts with federal

agencies. Indeed, these facts reinforce the conclusion that the parties operate in dissimilar markets.

Accordingly, this factor—similarity in goods or services—also weighs strongly in defendants' favor and against a finding of likelihood of confusion.

### (4) Similarity in the Parties' Facilities

This factor favors defendants, too, because the parties use different facilities to distribute their products or services.

Plaintiff contends—incorrectly and without support—that this factor is inapplicable because consumers in the internet age need not shop at a physical store. But the Fourth Circuit noted in *CareFirst* that where, as here, there are "basic differences between plaintiff's and defendant's modes of distributing their products," a consumer is less likely to be confused as to the origin of the parties' marks. 434 F.3d at 273 (quotation marks omitted). This is true because consumers are less likely to be confused if there are "significant differences between how consumers encounter the parties' respective marks in [distribution] facilities[.]" *Id.* Importantly, "[t]he relevant inquiry under this factor is whether the goods are sold to the same class of consumers in the same context." *Renaissance*, 405 F. Supp. 2d at 696.

Here, the parties' modes of distributing their products to their consumers are markedly different. On one hand, the HTC defendants sell the HTC Vive headset to the general consuming public through brick-and-mortar retail stores, as well as some online stores. On the other hand, plaintiff does not sell anything at retail or online, and nearly 100% of its revenue derives from successful government contracts bids. Thus, this factor, too, weighs significantly in defendants' favor and against a finding of likelihood of confusion.

21

## (5) Similarity in Advertising

The parties' approaches and investments in advertising are very different, and thus militate against a finding of likelihood of confusion. In analyzing this factor, courts consider: "[1] the media used, [2] the geographic areas in which advertising occurs, [3] the appearance of the advertisements, and [4] the content of the advertisements." *CareFirst*, 434 F.3d at 273. The Fourth Circuit also compares the *amount* of advertising between plaintiff and defendant. *See id.* (noting that advertising was dissimilar where one party "spends less than $2,000 per year on advertising" and the other "spends millions of dollars every year").

Despite this clear guidance, plaintiff argues that the parties use similar advertising simply because they all use the internet to promote their marks. But in making this argument, plaintiff bucks circuit precedent instructing courts to consider the appearance and content of the parties' advertisements. *See id.* Moreover, it is well-settled that the parties' mere use of the internet does not create a similarity in advertising. *See, e.g.*, *Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").[19]

Here, the undisputed record reflects that the parties have not engaged in similar modes of advertising. First, the parties spend vastly different sums on their advertisements. Specifically, plaintiff has spent only ▇▇▇▇ in advertising over the past three years, whereas the HTC defendants have dwarfed that amount, investing almost ▇▇▇▇▇ since 2015 in advertisements for the HTC Vive headset alone. In other words, in about half as much time the HTC defendants

---

[19] *See also Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 753 (E.D. Va. 2012) ("The sole overlap in the Parties' advertising is their use of the internet, in particular their internet stores. But that is no overlap at all."), *aff'd sub nom. Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150 (4th Cir. 2014).

have spent roughly 800 times more on advertising than plaintiff has. *See CareFirst*, 434 F.3d at 273 (noting that such stark differences in spending reflect dissimilarity in advertising). Second, the parties use different media and have different geographic targets. In this respect, it is undisputed that the HTC defendants advertise the HTC Vive headset nationwide and at trade shows, conferences, music festivals, brick-and-mortar locations, and online. In fact, defendants have advertised through an HTC-branded tractor-trailer that toured the U.S. for approximately six months. By contrast, the undisputed factual record reflects that although plaintiff attended trade shows, plaintiff did not prominently display its "VIVE" mark. Moreover, the content of plaintiff's advertisements differs from defendants'—plaintiff, unlike defendants, uses dense brochures with blocks of text directed at government entities. And given the small sum that plaintiff has spent on total advertising over three years, no reasonable jury could conclude that the geographic scope of plaintiff's marketing resembles defendants'. The undisputed factual record also confirms that plaintiff's online advertising also differs from defendants'. Indeed, plaintiff did not begin prominently displaying its "VIVE" mark on its website homepage until *after* plaintiff filed this lawsuit.

Finally, insofar as plaintiff contends that the parties' advertisements are similar in light of plaintiff's five-year-old "Moundsville Slammer" video game campaign maps, that argument is unpersuasive. As stated earlier, it is undisputed (1) that plaintiff did not brand these video game maps with plaintiff's "VIVE" mark, and (2) plaintiff was contractually prohibited from using these maps for any commercial purpose. *See supra* Part III.A.3. Thus, any advertising plaintiff may have conducted for its "Moundsville Slammer" video game maps is irrelevant and cannot forestall summary judgment.

Thus, this factor also firmly favors defendants and militates against a finding of likelihood of confusion.

### (6) Defendants' Intent

Similarly, defendants' intent—or lack thereof—weighs in favor of granting defendants' motion for summary judgment. The Fourth Circuit has held that "[t]he intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark." *CareFirst*, 434 F.3d at 273. Plaintiff contends that defendants intended to capitalize on plaintiff's goodwill because the PTO initially rejected HTC Corporation's attempts to register a "VIVE" mark, and thus HTC Corporation knew of plaintiff's mark. But mere *knowledge* of another's mark is different from *intent to cause confusion* as to the origin of that mark. *See George*, 575 F.3d at 398 ("[K]nowledge of another's goods is not the same as intent to mislead and to cause consumer confusion."). In any event, the undisputed factual record discloses that this factor weighs in defendants' favor, not plaintiff's. This is so because (1) HTC Corporation selected the HTC Vive name in early 2015, (2) defendants were unaware of plaintiff and plaintiff's mark when HTC Corporation adopted the "VIVE" mark, and (3) HTC Corporation initially chose "Re Vive" to market the HTC Vive. Thus, in the words of the *George* court, defendants "understandably chose [Vive]" and plaintiff has "presented no meaningful evidence that [defendants] wished to capitalize on [plaintiff's] trademark." *Id.* (affirming summary judgment against plaintiff). In short, the factual record is devoid of any evidence that would permit a reasonable juror to conclude that defendants *intended* to capitalize on plaintiff's relatively weak and unknown mark.

This is also true insofar as plaintiff has claimed a reverse confusion theory of trademark infringement. Indeed, to prove likelihood of confusion under a reverse confusion theory, plaintiff

24

would have to show that plaintiff's customers are likely to think that defendants are sponsoring plaintiff's "VIVE" process and environment. *See* 4 McCarthy on Trademarks § 23:10. But there is no evidence in this record that defendants intended to confuse plaintiff's customers—federal agencies and commercial entities—into believing that plaintiff's contract bids and "VIVE" environment or process were somehow backed by HTC or Valve.

Thus, this factor also supports defendants and weighs against finding a likelihood of confusion.

## (7) Actual Confusion

This factor also favors defendants. Actual confusion is typically the "most important factor" in the likelihood-of-confusion inquiry. *George*, 575 F.3d at 398; *see also CareFirst*, 434 F.3d at 268 (observing that evidence of actual confusion "is often paramount in the likelihood-of-confusion analysis" (quotation marks omitted)). A plaintiff may show actual confusion with either anecdotal or survey evidence. *See George*, 575 F.3d at 398. Indeed, "given the proper factual setting, even just a few instances of actual confusion can provide very persuasive evidence of how and why confusion can occur." 4 McCarthy on Trademarks § 23:14. Yet, although anecdotal evidence may sometimes support a finding of actual confusion, it is also true that "[e]vidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." *Id.*[20]

In the instant case, defendants correctly note that plaintiff has failed to cite any competent evidence of actual confusion sufficient to create a triable issue of fact. Indeed, plaintiff's only

---

[20] *See also Int'l Ass'n of Machinists & Aerospace Works, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200-201 (1st Cir. 1996) ("Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.").

purported evidence of actual confusion derives from (1) a comment by Robert Staher—a friend of plaintiff's founder and CEO, a trustee of plaintiff's stock option ownership plan, and a member of plaintiff's management team who admitted that he is not one of plaintiff's consumers—and (2) an unreliable likelihood-of-confusion survey that has been excluded pursuant to Rule 702, Fed. R. Evid., because the survey, *inter alia*, altered the parties' marks from how they appear in commerce. Needless to say, the single opinion regarding actual confusion from a plaintiff-insider who happens to be the CEO's friend (but has never been one of plaintiff's consumers) carries no weight here.[21] And plaintiff's unreliable survey is properly disregarded. Thus, no reasonable juror could find actual confusion regarding the parties' marks. This is hardly surprising, because the summary judgment record also reflects that no one— besides sophisticated federal agencies and artificial entities—has ever sought to purchase anything from plaintiff.

---

[21] *See, e.g.*, *Packman v. Chi. Trib. Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding that the supposed actual confusion among four of plaintiff's friends, none of whom had attempted to purchase the parties' goods, was "irrelevant to the question of confusion" because the four friends "were not relevant consumers under the Lanham Act" and, at best, showed "de minimis evidence of confusion" (quotation marks omitted)); *Art Attacks Ink, LLC, v. MGA Entm't Inc.*, 581 F.3d 1138, 1147 (9th Cir. 2009) (rejecting evidence of actual confusion from witnesses who were "employees or personal friends" of the plaintiff company's founder); *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 162 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) (finding that plaintiff's anecdotal evidence of actual confusion among friends and family members "does not suffice to raise a genuine issue of material fact as to consumer confusion, especially given that this inquiry focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections").

Defendants have moved for leave to file a supplemental pleading to address Staher's claim of actual confusion. But because Staher's statements do not merit any weight, defendants' motion for leave need not be addressed.

Therefore, the "actual confusion" factor weighs heavily in defendants' favor and against finding a likelihood of confusion.[22]

### (8) The Quality of the HTC Vive Headset

Both parties agree that this factor is irrelevant here. This is so because the quality of a defendant's product is typically germane only in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods. *George*, 575 F.3d at 399 (quotation marks omitted).

### (9) The Consuming Public's Sophistication

Given that plaintiff's consumer base comprises sophisticated entities, this final factor supports defendants, because plaintiff's consumers are unlikely to have been confused about the source of the parties' marks, goods, or services.

Where, as here, the relevant market is sophisticated, this factor may be of paramount importance in the likelihood-of-confusion analysis. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) ("Although no one factor is dispositive of the 'likelihood of confusion' inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names."). To be sure, the consuming public's sophistication is relevant only where "the relevant market is not the public at-large." *George*, 575 F.3d at 400. But this factor is apposite here because (1) plaintiff

---

[22] Although not pertinent to the summary judgment analysis, it is nonetheless worth noting that defendants' expert, Hal Poret, conducted a survey in accordance with well-settled and accepted methods in trademark infringement cases, finding that there was 0% confusion among potential consumers. Yet, even without this survey, the undisputed factual record clearly reflects that the "actual confusion" factor heavily favors defendants.

has invoked the *reverse* confusion theory, thus rendering plaintiff's consumer base relevant,[23] and (2) the undisputed factual record discloses that plaintiff's consumers are not the public at large. Indeed, plaintiff's relevant market includes especially sophisticated consumers, namely, NASA and the Department of Veterans Affairs, that make purchasing decisions based on detailed proposals and thorough bidding processes.[24] Moreover, it is undisputed that consumers of the HTC Vive headset, and consumers of virtual reality products in general, are sophisticated purchasers who generally consider the differences in available virtual reality goods, including the HTC Vive headset.

Thus, the uncontroverted evidence shows that this final factor also weighs decisively in defendants' favor and against a likelihood of confusion.

* * * *

In sum, none of the relevant factors militates in favor of finding a likelihood of confusion. Instead, seven of the eight applicable likelihood-of-confusion factors weigh strongly in defendants' favor, and one factor—the strength of the parties' marks—slightly favors defendants. Given this undisputed factual record, no reasonable juror could find a likelihood of "forward" confusion or "reverse" confusion with respect to the parties' "VIVE" marks. Indeed, there is simply no evidence in this record (1) that customers would likely mistake the HTC Vive headset as connected with plaintiff's goods or services (forward confusion), or (2) that plaintiff's

---

[23] *See* 4 McCarthy on Trademarks § 23:10 ("In a traditional case claiming 'forward' confusion[,] the proper universe to survey is the potential buyers of the junior user's goods or services, but in a 'reverse confusion' case, it is appropriate to survey the senior user's customer base.").

[24] Plaintiff, in attempting to evade the conclusion that essentially 100% of its business revenue stems from government contracts with two federal agencies, further cemented the fact that plaintiff's customer base comprises sophisticated, artificial entities. Specifically, plaintiff identified two other customers over the last half-decade: the West Virginia High Technology Consortium Foundation and Lockheed Martin.

consumers are likely to contract with plaintiff under the mistaken impression that they were getting an HTC Vive headset (reverse confusion). At bottom, the parties sell different things through different channels to different customers. The undisputed factual record confirms that there is no trademark infringement here.

For the foregoing reasons, defendants are entitled to summary judgment on the Lanham Act claims, Counts I and II.[25]

## B. Count III: Cybersquatting

Count III alleges that HTC Corporation[26] violated § 1125(d)(1)(A) of the ACPA by registering and using three websites: (1) "www.htcvive.com," (2) "www.vive.com," and (3) "viveport.com." For the reasons that follow, plaintiff's ACPA claim fails.

As relevant here, the ACPA § 1125(d) provides that a defendant is liable if that defendant:

(i) has a bad faith intent to profit from [plaintiff's protected] mark . . . and

(ii) registers, traffics in, or uses a domain name that—

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark
> . . . .

15 U.S.C. § 1125(d)(1)(A).

---

[25] Defendant Valve further argues that it is entitled to summary judgment because Valve does not sell or receive any revenue from sales of the HTC Vive headset, and thus Valve has not engaged in any conduct likely to cause confusion among consumers. Because the undisputed factual record discloses that no reasonable juror could find a likelihood of confusion, Valve's additional arguments need not be reached here.

[26] As previously stated, the cybersquatting claims against defendants HTC America and Valve were dismissed pursuant to an Order dated January 13, 2017. *See supra* note 1.

The key dispute on summary judgment is whether HTC Corporation acted with a bad faith intent to profit from plaintiff's "VIVE" mark. In this respect, the statute provides a non-exclusive list of nine factors to consider in evaluating bad faith intent to profit, including:

1) defendant's trademark or other intellectual property rights in the allegedly offending domain name,

2) whether the domain name contains defendant's legal name,

3) defendant's prior use of the domain name in connection with a bona fide business,

4) defendant's bona fide noncommercial or fair use of the mark,

5) defendant's intent to divert customers from plaintiff,

6) defendant's offer to sell the domain name,

7) defendant's provision of false registration information,

8) defendant's registration or acquisition of multiple domain names with knowledge that the domain names are identical or confusingly similar to plaintiff's mark, and

9) the strength of plaintiff's mark.

*See id.* § 1125(d)(1)(B)(i).[27]

---

[27] As HTC Corporation correctly notes, the "paradigmatic" cybersquatting claim involves a defendant seeking to sell allegedly infringing domains to the holder of a protected mark. *See Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005). Yet defendant incorrectly asserts that the paradigm also constitutes a ceiling—that the ACPA covers no more than a defendant's extortionate offer to sell an infringing domain name to the trademark owner. To prevail on an ACPA claim, a plaintiff need not prove that a cyber-squatter made an extortionate demand. This is because, as the *Lamparello* court observed, the ACPA was enacted "to stop the registration of [i] multiple marks with the hope of selling them to the highest bidder, [ii] distinctive marks to defraud consumers or to engage in counterfeiting activities, and [iii] well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site[.]" *Id.* Indeed, an extortionate demand is merely one of nine non-exclusive factors to consider when determining whether a defendant acted with a bad faith intent to profit, in violation of the ACPA. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VI); *see also Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 435 (S.D.N.Y. 2013) (noting that an "extortionate demand" is not "always necessary" to prove an ACPA violation).

Nonetheless, given the undisputed factual record here, no reasonable jury could conclude that HTC Corporation acted with bad faith intent to profit within the meaning of the ACPA.

None of these factors supports plaintiff's ACPA claim. Importantly, "the first four factors suggest circumstances that may tend to indicate an *absence* of bad faith intent to profit." *Lamparello v. Falwell*, 420 F.3d 309, 319 (4th Cir. 2005) (emphasis added) (quotation marks and brackets omitted). The final five factors "suggest circumstances that may tend to indicate that such bad-faith [intent to profit] exists." *Id.* Yet, "[t]here is no simple formula for evaluating and weighing these factors," and therefore "courts do not simply count up which party has more factors in its favor after the evidence is in." *Id.* (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002)). Indeed, the Fourth Circuit instructs that "[t]he ACPA allows a court to view the totality of the circumstances in making the bad faith determination." *Newport News Holding Corp. v. Virtual Vision, Inc.*, 650 F.3d 423, 435 (4th Cir. 2011). In this respect, "a key factor in the bad faith determination" is the defendant's intent to "register a variety of domain names, but not to use them." *See Domain Name Clearing Co., LLC v. F.C.F. Inc.*, 16 F. App'x 108, 110 (4th Cir. 2001).

Here, summary judgment must be awarded to defendant HTC Corporation because no reasonable juror, given the totality of circumstances as reflected in the undisputed factual record, could find that HTC Corporation had a bad faith intent to profit from plaintiff's mark. To begin with, the first factor supports HTC Corporation, as the undisputed record reflects that HTC Corporation has intellectual property rights in, and independently selected, the "VIVE" mark. The second factor is neutral as to "www.vive.com," and "viveport.com," but favors HTC Corporation with respect to "htcvive.com," because the latter site includes HTC Corporation's legal name. And the third and fourth factors—prior use of the domain and noncommercial or fair use of the mark—do not establish bad faith here. *See Lamparello*, 420 F.3d at 319 (noting that the first four factors reflect the "absence of bad faith intent to profit").

None of the remaining factors—which help to establish bad faith—forestalls summary judgment for HTC Corporation. *See id.* Regarding the fifth factor—intent to divert customers—there is no evidence in the summary judgment record that HTC Corporation intended to prey on consumer confusion or intercept plaintiff's customers, namely, artificial entities such as NASA and the Department of Veterans Affairs. Nor is there any evidence in this record that plaintiff's sophisticated consumers were indeed diverted away from plaintiff's website. In fact, it is undisputed that plaintiff has never registered a website using its "VIVE" mark, which further undermines plaintiff's claim that HTC Corporation had a bad faith intent to profit. Similarly, the sixth and seventh bad-faith factors favor HTC Corporation, as plaintiff concedes that HTC never offered to sell plaintiff a domain name and never provided false registration information. And although there is some record evidence that, under the eighth factor, HTC Corporation may have known that its domain names could be confusingly similar to plaintiff's mark, the totality of the circumstances belie plaintiff's ACPA claim. *See George*, 575 F.3d at 398 (noting that, in the trademark infringement context, "knowledge of another's goods is not the same as intent to mislead and to cause consumer confusion"). And the final factor—the mark's weakness—weighs heavily against plaintiff.[28] The undisputed factual record further confirms that HTC Corporation had a good faith basis for registering its domain names. Indeed, HTC Corporation owns trademark rights for "VIVE" in several countries and, as the record reflects, uses the challenged websites in connection with selling and advertising its HTC Vive headset. *Cf. Domain Name*

---

[28] *See supra* Part III.A.1 (observing that plaintiff's "VIVE" mark is conceptually and commercially weak).

*Clearing Co.*, 16 F. App'x at 110 (concluding that "a key factor in the bad faith determination" is an intent to "register a variety of domain names, but not to use them").

Given the totality of circumstances and the undisputed factual record, no reasonable juror could conclude that HTC Corporation acted with bad faith intent to profit from plaintiff's mark. Thus, HTC Corporation is entitled to summary judgment on plaintiff's cybersquatting claim.

## IV.

For the foregoing reasons, plaintiff's motion for summary judgment must be denied, and defendants' cross motion for summary judgment must be granted.

An appropriate Order will issue.

Alexandria, Virginia
March 15, 2017

/s/

T. S. Ellis, III
United States District Judge