# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

VALADOR, INC.,

   Plaintiff,

v.

HTC CORPORATION, HTC AMERICA, INC., and VALVE CORPORATION,

   Defendants.

Case No. 1:16–cv–01162  TSE/JFA

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .................................................................................................................2

    I.      Legal Standard ..............................................................................................2

    II.     Defendants Are Entitled To Reasonable Attorneys' Fees Because This Is An Exceptional Case ....................................................................................3

          A.     Defendants Are The "Prevailing Party" .........................................3

          B.     Plaintiff's Claims Lacked Any Substantive Strength ....................3

          C.     Plaintiff's Litigation Conduct Was Unreasonable .......................11

               1.     Plaintiff Refused To Comply With This Court's Orders ..............13

               2.     Discovery Violations Related To Its Alleged Headset Product ...........................................................................................15

               3.     Plaintiff Misled Defendants Regarding Certain Witnesses ..........17

               4.     Plaintiff Twice Changed its Website to Support its Claims ..........19

    III.    Defendants' Attorneys' Fees Are Reasonable .......................................20

          A.     Defendants Only Seek Recovery For Hours Reasonably Expended On This Case At Reasonable Rates ...........................21

               1.     Defendants' Hours Billed Were Reasonable ................................23

               2.     Defense Counsel's Hourly Rates Were Reasonable .....................26

          B.     Defendants Have Applied Reasonable Reductions...................28

CONCLUSION...............................................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allora, LLC v. Cambridge Builders of Johnston Cty., Inc.*,
532 Fed. App'x 349 (4th Cir. 2013) ................................................................ 20-21

*Barber v. Kimbrell's, Inc.*,
577 F.2d 216 (4th Cir. 1978) ........................................................................ *passim*

*Buckhannon Bd. & Care Home v. W.V. Dept. of Health & Human Res.*,
532 U.S. 598 (2001) .............................................................................................. 3

*Design Res., Inc. v. Leather Indus. of Am.*,
No. 10-CV-157, 2016 WL 5477611 (M.D.N.C. Sept. 29, 2016) ................... *passim*

*Donut Joe's, Inc. v. Interveston Food Servs., LLC*,
116 F. Supp. 3d 1290 (N.D. Ala. 2015) ............................................................. 7

*Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*,
No. CV 14-1918, 2015 U.S. Dist. LEXIS 178443 ............................................. 7

*Georgia-Pacific Consumer Prod. LP v. von Drehle Corp.*,
781 F.3d 710 (4th Cir. 2015) ................................................................... 2, 3, 11

*In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*,
No. MDL 05-1708, 2011 WL 6056463, at *2 (D. Minn. Dec. 6, 2011) ............. 25

*Kimberly–Clark Corp. v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir. 1984) .................................................................. *passim*

*Monster Daddy v. Monster Cable Prod., Inc.*,
No. 10-CV-1170, 2014 WL 2780331 (D.S.C. June 19, 2014) ............................ 3

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014) .................................................................................... 2, 3

*Synthon IP, Inc. v. Pfizer Inc.*,
484 F. Supp. 2d 437 (E.D. Va. 2007), *aff'd*, 281 Fed. App'x 995 (Fed. Cir. 2008) ........................................................................................................ 20, 21

*Taylor v. Republic Servs., Inc*,
No. 1:12-CV-00523, 2014 WL 325169 (E.D. Va. Jan. 29, 2014) ..................... 26

*Two Men and a Truck/Int'l, Inc. v. A Mover Inc.*,
    128 F. Supp. 3d 919 (E.D. Va. 2015) ...................................................................21, 26, 27, 28

*Virginia-Pilot Media Cos., LLC v. Dep't of Justice*,
    Civ. No. 2:14-cv-577, 2016 WL 4265742 (E.D. Va. Aug. 10, 2016)...............................21, 27

**Statute & Rules**

15 U.S.C. § 1117(a) ...............................................................................................................2, 3

Defendants HTC Corporation ("HTC Corp."), HTC America, Inc. ("HTC America," and together with HTC Corp, "HTC") and Valve Corporation ("Valve") (together with HTC, "Defendants") respectfully submit this memorandum in support of their motion for attorneys' fees.

## PRELIMINARY STATEMENT

This case never presented objectively reasonable trademark infringement and cybersquatting claims. Far from the standard trademark infringement case, here the parties were never even colorable competitors selling congruous products to comparable consumer bases. Nor, based on Plaintiff's own admissions and the publicly available facts, was there any conceivable basis to assert cybersquatting. The fact that this case was brought—nearly a year after Plaintiff became aware of HTC's use of the Vive mark and over 18 months after the highly public release of the HTC Vive—with a simultaneously filed preliminary injunction motion heading into the fourth quarter holiday sale cycle is hardly coincidence. Rather, as demonstrated by emails exchanged between Plaintiff, its counsel, and Robert Starer, the single witness of alleged actual confusion who turns out to have been involved in the litigation strategy prior to the date of his alleged confusion, this case was brought in an effort to extract a windfall damage award or inequitable settlement payout divorced from any alleged damage. *See* Ex. 1.

The case began with Plaintiff's ill-fated attempt to obtain a preliminary injunction without providing any evidence to support its extraordinary request, thereby depriving Defendants (and the Court) of the early ability to understand the true nature of Plaintiff's claims. As the case progressed, Plaintiff's twice undertook an "evolution" from a "high end consulting services" provider geared toward sophisticated government agencies to a video game developer to a reseller of cheap, plastic virtual reality goggles, all in a gambit to portray itself as an HTC competitor and to manufacture the market overlap.

The objectively unreasonable nature of Plaintiff's claims was exacerbated by Plaintiff's unreasonable litigation conduct. There can be no question that the facts of this case, and the theories and alleged "evidence" set forth by Plaintiff, cause it to stand out from other trademark infringement and cybersquatting cases filed in this and other federal courts. Under prevailing legal standards, this case was, and should be deemed by this Court as, "exceptional," thereby entitling Defendants to recover their attorneys' fees incurred in defending themselves against Plaintiff's imprudently filed lawsuit.

## ARGUMENT

### I.    LEGAL STANDARD

In exceptional cases such as this, the Court "may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). A case is deemed "exceptional" where, based upon the totality of the circumstances and assessed according to the preponderance of the evidence standard, it "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756, 1758 (2014); *see also Georgia-Pacific Consumer Prod. LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015). This case is exceptional under either prong.

The district courts, in exercising their discretion on a case-by-case basis under the totality of the circumstances, may find a case "exceptional" when "(1) there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable, (2) the non-prevailing party has litigated the case in an unreasonable manner, or (3) there is otherwise the need in particular circumstances to advance considerations of compensation and deterrence." *Georgia-Pacific*, 781 F.3d at 721 (internal

citations omitted).  "This standard allows for a 'showing of something less than bad faith; and '[r]elevant considerations include economic coercion, groundless arguments, and failure to cite controlling law."  *Design Res., Inc. v. Leather Indus. of Am.*, No. 10-CV-157, 2016 WL 5477611, at *2 (M.D.N.C. Sept. 29, 2016) (quoting *San Francisco Oven, LLC v. Fransmart, Inc.*, 222 Fed. App'x 235, 237 (4th Cir. 2007)).

## II.   DEFENDANTS ARE ENTITLED TO REASONABLE ATTORNEYS' FEES BECAUSE THIS IS AN EXCEPTIONAL CASE

### A.   Defendants Are The "Prevailing Party"

Defendants prevailed with respect to all counts in this case.  *See id.* at *1, *15 (granting defendants' exceptional case motions following successful motions for summary judgment); *see also Buckhannon Bd. & Care Home v. W.V. Dept. of Health & Human Res.*, 532 U.S. 598, 605 (2001); *Monster Daddy v. Monster Cable Prod., Inc.*, No. 10-CV-1170, 2014 WL 2780331, at *4 (D.S.C. June 19, 2014) ("An award of attorney's fees to the prevailing party under 15 U.S.C. § 1117(a) is equally available to prevailing plaintiffs and defendants.").

### B.   Plaintiff's Claims Lacked Any Substantive Strength

Post-*Octane*, a court may consider a case "exceptional" if the meritless nature of the "substantive strength of a party's litigating position (considering both the governing law and the facts of the case)" sets it apart from the typical case.  *Octane Fitness*, 134 S. Ct. at 1756.  Thus, where "there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable," a case may be deemed "exceptional."  *Georgia-Pacific*, 781 F.3d at 721.

"Objectively unreasonable claims are judged based on an objective assessment of the merits of the challenged claims and defenses."  *Design Res.*, 2016 WL 5477611, at *2.  (internal quotes omitted).  "This standard requires that the claim be so unreasonable that no reasonable

litigant could believe it would succeed." *Id.* (internal quotes omitted).  The non-prevailing party's claims need not be objectively unreasonable at the time they were first asserted, but can become so over time, *id.* at *4 (citing *Georgia-Pacific*, 781 F.3d at 720), such that "a party's position and litigation approach may move from being objectively reasonable to becoming unreasonable and perhaps exceptional," *id.*  In assessing whether a non-prevailing party's claims are initially or later become objectively unreasonable, the courts should be cognizant that

> [a] party has an on-going responsibility to evaluate the merits of its case and positions.  Should a position, even if previously not within the purview of exceptional behavior, migrate to a questionable classification, a party has the responsibility to react and respond accordingly.  Thus, a party should continue to evaluate the reasonableness of its litigation strategy as the case progresses to ensure that conduct does not cross the line from reasonable to questionable.

*Id.* at *5 (citing *Lumen View Tech. LLC v. Findthebest.com, Inc*., 811 F.3d 479, 482-83 (Fed. Cir. 2016) and *Kilopass Tech., Inc. v. Sidense Corp*., 738 F.3d 1302, 1310-11 (Fed. Cir. 2013)).

Here, for the reasons argued at length in other motions filed in this litigation, *see, e.g.*, Dkt. 148 at 8-14, Plaintiff's claims were objectively unreasonable starting with the original complaint.  Plaintiff's two stark shifts in its factual theories, made in an effort to create the market overlap that this Court, from the very first hearing, identified as a fundamental requisite for Plaintiff to prevail, did not cure the objectively unreasonable nature of the claims, but rather compounded the problem.  Plaintiff's reliance upon evidence of actual confusion provided by Robert Starer was improper from the start given Mr. Starer's direct involvement with the pursuit of this litigation.  And, Plaintiff's attempted introduction of new "evidence" (after the Court had ordered Plaintiff to complete its discovery) in order to end-run the clear deficiencies in its infringement theory illustrates the unreasonableness of its claims.

Even assessing the claims with all the evidence, as the Court did in its summary judgment decision, reveals the substantively weak and objectively unreasonable nature of Plaintiff's

claims.  The Court held that not even one of the eight relevant likelihood of confusion factors favored Plaintiff and that none of the nine bad faith intent to profit factors supported Plaintiff's cybersquatting claim.  *See* Dkt. 291 at 28 ("In sum, none of the relevant factors militates in favor of finding a likelihood of confusion."); *id.* at 31 ("None of these factors supports plaintiff's ACPA claim.").  Specifically, the Court concluded that "seven of the eight applicable likelihood-of-confusion factors weigh strongly in defendants' favor," while the single remaining factor—the strength of the parties' marks—still "slightly favors defendants."  *Id.* at 28.  (emphasis added).  This conclusion was unavoidable given that, as the Court stated no less than four times, "plaintiff and defendants sell dissimilar things through different channels in disparate markets."  *Id.* at 9, 11, 17, 29.

This was a key fact that Defendants, and the Court,[1] focused on from the beginning of the case.  Plaintiff, for its part, employed varying characterizations and descriptions of its business offerings that were ultimately not only unsupported by any credible evidence, but also directly contradicted by consistent testimony from Plaintiff's own witnesses.[2]

---

[1] *See* Ex. 2 (Oct. 27 Hr'g Tr.) at 10:1–11:19 (repeatedly focusing on "central issue" of similarity between goods and markets); *id.* at 17:1:3 (discussing use of survey experts to determine "whether these markets intersect or cross in any way"); *id.* at 20:2-11 (focusing on fact that "controlling law puts great emphasis on likelihood of confusion and whether the markets are related" and stating the parties "need to look hard at [the main issue] to consider what kind of evidence you need to present") (emphasis added); Ex. 3 (Oct. 28 Hr'g Tr.) at 18:20–19:24 (drawing attention to key issues and cases); Ex. 4 (Dec. 2 Hr'g Tr.) at 8:4-5 ("If there are different markets, it's hard to see how there could be confusion."); *id.* at 9:5-10 (stating "the heart of the matter" regarding market overlap); *id.* at 38:9-25 (identifying market overlap as key issue of dispute); Ex. 5 (Jan. 27 Hr'g Tr.) at 8:12-18 (questioning whether parties are competitors); Ex. 6 (Feb. 17 Hr'g Tr.) at 32:24-33:3 (questioning Plaintiff's belated attempt to position itself as a direct competitor).

[2] *See* Ex. 7 (Jan. 13 Hr'g Tr.) at 31:17–32:4 (relying on Second Amended Complaint's allegations of direct competition); Ex. 5 (Jan. 27 Hr'g Tr.) at 8:2-11, 8:19–9:22 (representing at length to Court that parties are direct competitors); Ex. 6 (Feb. 17 Hr'g Tr.) at 33:8-17 (stating that Plaintiff "produce[s] software, the headsets, virtual reality images"); Dkt. 177 at 3 (basing summary judgment on excluded evidence).

Plaintiff's claims do not reflect reasonable interpretations of the evidence, and thus the objective reasonableness standard is satisfied. *See Design Resources*, 2016 WL 5477611, at *5-6 (finding case exceptional based on plaintiff's failure to appreciate the lack of substantive strength of its claims "particularly by the conclusion of discovery" and collecting similar exceptional cases). It is worth highlighting certain aspects of the Court's decision and the Plaintiff's meritless assertions to illustrate the objectively unreasonable nature of Plaintiff's case.

For example, in assessing each of the seven factors weighing strongly in Defendants' favor, the following points justify the exceptional nature of this case:

- The Court concluded that the similarity-of-the-marks factor "weighs <u>decisively</u>" in Defendants' favor and observed that, "[n]otably, plaintiff relies exclusively on a comparison of the *texts* of the two marks, but plaintiff does not—and cannot—contest that the marks have different appearances in the marketplace." Dkt. 291 at 17 (underlined emphasis added).

- The Court concluded that the similarity-of-goods-or-services factor "<u>severely undermines</u> plaintiff's Lanham Act claims" because "the parties' marks identify <u>strikingly</u> different goods or services in different markets," *id.*, and the parties have "<u>significantly</u> different customer bases," *id.* at 19 (emphasis added).

- The Court concluded that the similarity-of-the-facilities factor "weighs <u>significantly</u>" in defendants' favor, and rejected Plaintiff's attempt to discount this factor on the grounds that Plaintiff's legal argument was "incorrect[] and without support." *Id.* at 21 (emphasis added).

- The Court concluded that the similarity-in-advertising factor "<u>firmly</u> favors defendants" and determined that Plaintiff's assertion as to the similarity of the parties' advertising based on both parties' use the internet was contrary to "clear guidance" in the Fourth Circuit and "<u>bucks circuit precedent</u> instructing courts to consider the appearance and content of the parties' advertisements." *Id.* at 22 (emphasis added). Additionally, in an attempt to create advertising overlap, Plaintiff altered its website "*after*" filing its lawsuit in order to display its VIVE mark. *Id.* at 23 (emphasis in original).

- The Court concluded that the intent factor favored Defendants because "the factual record is <u>devoid of any evidence</u> that would permit a reasonable juror to concluded that defendants *intended* to capitalize on plaintiff's relatively weak and unknown mark." *Id.* at 24 (underlined emphasis added).

- The Court concluded that the actual confusion factor "weighs <u>heavily</u>" in Defendants' favor, *id.* at 27 (emphasis added), because Plaintiff "failed to cite any competent evidence of actual confusion," which the Court considered "hardly surprising" given the Plaintiff's extremely limited and sophisticated customer base, *id.* at 26.

- The Court concluded that the sophistication-of-the-parties factor "weighs <u>decisively</u>" in Defendants' favor, a fact that Plaintiff essentially conceded in its multiple complaints, yet refused to concede in its summary judgment briefing.

The Court's conclusion that Plaintiff's case lacked merit followed with respect to Plaintiff's cybersquatting claim, where the Court found that none of the bad faith factors favored Plaintiff and, based upon both Plaintiff's key concessions and failure to offer any supporting evidence, the undisputed factual record established that HTC had a good faith basis for registering its accused domain names. *See id.* at 31-32.

The Court's conclusions, standing alone, establish that this case is exceptional under §1117(a). *See Donut Joe's, Inc. v. Interveston Food Servs., LLC*, 116 F. Supp. 3d 1290 (N.D. Ala. 2015) (granting exceptional case motion where plaintiff failed to withstand summary judgment where relevant factors weighed heavily against plaintiff); *see also Dzinesquare, Inc. v. Armano Luxury Alloys, Inc*., No. CV 14-1918, 2015 U.S. Dist. LEXIS 178443, at *9-12 (concluding that "[plaintiff's] dearth of evidence to at least create a genuine dispute regarding its claim indicates a very weak litigation position" and rendered the case exceptional given that "the claims are clearly groundless and unreasonable in light of [plaintiff's] lack of evidence to support its claims").

Additional support for an exceptional case finding stems from Plaintiff's summary judgment briefing and discovery practices, which demonstrates Plaintiff's unwillingness to accept unavoidable conclusions and a tendency to either rely upon clearly inapplicable or

-7-

inappropriate evidence (or not offer any evidence) to support its positions.[3]  First, Plaintiff refused to acknowledge that not selling its "VIVE" meant that it could not have a valid claim for trademark infringement.  The Court expounded upon this failure at length.  *See* Dkt. 291 at 3-4, 4 n.5, 18-19.  By continuing to press its trademark infringement claims notwithstanding the numerous, consistent, and undisputed admissions by its witnesses that Plaintiff's VIVE "is not itself a physical product, game, service, or stand-alone software," *id.* at 3, Plaintiff proceeded with an objectively unreasonable and substantively meritless claim.  Even after those dispositive admissions, Plaintiff's counsel continued to represent to this Court that Plaintiff's VIVE was a software application that could be provided to a customer as a standalone product.  *See id.*  No evidence supports those repeated representations; to the contrary, Plaintiff's CEO and COO consistently testified that it was not a standalone product.  Notably, as detailed below in Section II.C.1, Plaintiff was ordered to produce a copy of its alleged software, but never produced anything which could support Plaintiff's repeated representations to the Court.

Second, Plaintiff attempted to overcome this obvious, fatal problem by improperly relying upon what it repeatedly referred to as "video games" called "Moundsville Slammer." Plaintiff presented this evidence in support of its alleged use of the VIVE mark in commerce, and thereby required Defendants to devote considerable resources in discovery, wherein it was revealed that (1) the Moundsville Slammer was not a free-standing video game, but was merely a "map" for use with a third-party's application; (2) the Moundsville Slammer was never sold, was never intended to be sold, and was prohibited by contract from being sold, *id.* at 5, 20, 23, and most importantly, (3) the Moundsville Slammer was not named VIVE, branded as VIVE, or in

---

[3] The fact that Plaintiff twice attempted to reinvent its factual theories to respond to Court concerns and overcome its own witness' prejudicial testimony establishes the inherent weakness of its claims and Plaintiff's refusal to acknowledge that weakness.  *See* Dkt. 267 at 8-14 (detailing the shifting sands nature of Plaintiff's case).

any way disclosed to the public as related to Plaintiff's VIVE, *id.* at 20.  Consequently, by using the Moundsville Slammer "evidence" to press its trademark infringement claims about the VIVE mark, Plaintiff proceeded in an objectively unreasonable manner and in pursuit of a substantively weak claim.

Third, Plaintiff failed to heed the consequence that flowed logically from the fact that almost one-hundred percent of its revenue (or at least ninety-eight percent) was derived through high-priced government contracts with only two government agencies.  *See* Dkt. 291 at 3, 21. Instead, Plaintiff injected unsupported allegations of revenue from commercial sources that either could not be identified, were outdated (e.g., Lockheed), or were *de minimis* (e.g., the one-off West Virginia High Technology Consortium Foundation).  *Id.* at 3 n.4.  These facts reveal a fundamental, substantive weakness in Plaintiff's claims that Plaintiff refused to acknowledge.[4]

Fourth, Plaintiff proceeded with its claims despite having no credible evidence of actual confusion, which the Court rightly noted "is typically the most important factor in the likelihood-of-confusion inquiry."  *Id.* at 25 (internal quotes omitted).  Notwithstanding clear law indicating that actual confusion evidence must be more than *de minimis* and cannot include friends, employees, or non-consumers, Plaintiff identified just a single witness, Robert Starer, who was all three—"a friend of plaintiff's founder and CEO, a trustee of plaintiff's stock option ownership plan, and a member of plaintiff's management team who admitted that he is not one of plaintiff's consumers."  *Id.* at 26.  The law is unequivocal that such evidence is irrelevant, prompting the Court to conclude that, "[n]eedless to say, the single opinion regarding actual

---

[4] In fact, Plaintiff has contended the opposite since the start of this case.  *See* Ex. 1 (Oct. 27 Hr'g Tr.) at 13:24–14:16 (stating "yes" when asked by the Court if Plaintiff's witness will "be able to testify that he sells to the same market, to the same types of customers").

confusion from a plaintiff-insider who happens to be the CEO's friend (but has never been one of plaintiff's consumers) carries no weight here." *Id.*

Not only was Plaintiff's presentation of Mr. Starer as a witness contrary to the law, it was also contrary to the facts. The alleged evidence of Mr. Starer's "confusion" was flatly contradicted by his own emails, which established that Mr. Starer was involved in Plaintiff's litigation effort for at least a month prior to his claimed confusion. *See* Dkt. 268-1 (VALADOR 000000346). Those emails were obtained late in discovery by Defendants only after the filing of a motion to compel over improper assertions of attorney-client privilege as to Mr. Starer in his capacity as a third-party witness. Plaintiff steadfastly refused to acknowledge the futility of presenting Mr. Starer as a witness, arguing at the summary judgment hearing that Mr. Starer could testify to his confusion, despite approving a cease and desist letter regarding Plaintiff's claim of trademark infringement one month prior to his alleged confusion. *See* Ex. 8 (March 3 Hr'g Tr.) at 40:12–43:21 ("The COURT: He'll change his testimony. MR. KAHLE: Not at all. THE COURT: I used to do what you do."). Plaintiff's conduct, which is contrary to the evidence, removes this case from the range of typical cases and acceptable presentations of competing facts, and demonstrates that Plaintiff's claims lacked substantive strength, and that Plaintiff acted in an objectively unreasonable manner in proceeding both with its meritless claims and with its presentation of self-serving testimonial evidence that was plainly contradicted by the documentary evidence obtained by Defendants in discovery.

Finally, Plaintiff's proffered expert survey stands out from what could be considered objectively reasonable because no reasonable interpretation of the law would permit a conclusion that the survey was admissible. The Court detailed the lack of Plaintiff's expert qualifications and the serious flaws with the survey in its 24-page Order. *See* Dkt. 290. The Court held that

the survey was so flawed that is was unreliable and inadmissible. Specifically, the Court concluded that the "survey (1) failed to evaluate the proper universe of respondents, (2) did not replicate market conditions, (3) neglected to use a control group, (4) eschewed the recognized methodologies for conducting trademark confusion surveys, and (5) asked improperly leading questions." Dkt. 289 at 12. While any one of these grounds could have warranted exclusion in its own right, the combination of all five fatal defects renders the survey so flawed that Plaintiff knew or should have known it lacked evidentiary value. Indeed, the fact that Plaintiff's survey expert "deliberately altered defendants' mark to make it appear more similar to plaintiff's before asking questions about the marks' likelihood of confusion," *id.* at 18, should have been sufficient, without more, to alert Plaintiff to the questionable nature of the survey. The Court's conclusion that the survey methodology was "antithetical to trademark analysis," *id.*, establishes the Plaintiff's objectively unreasonable reliance on it.

The above noted substantive deficiencies with Plaintiff's case, taken together, establish that Plaintiff acted unreasonably in pursuing its meritless claims of trademark infringement and cybersquatting against Defendants. Plaintiff's conduct in prosecuting this action forced Defendants to incur substantial fees, and business disruption, thereby prejudicing Defendants during a critical phase in the launch of the HTC Vive product. Accordingly, it was objectively unreasonable for Plaintiff to pursue its claims against Defendants because it should have been apparent that its own evidence and legal theories were so substantively weak that there could not have been an objectively reasonable chance of success on the merits.

### C.     Plaintiff's Litigation Conduct Was Unreasonable

In addition to the substantive deficiencies that permeated Plaintiff's case, the manner in which Plaintiff litigated this case was unreasonable, thereby providing the Court with an independent basis for finding this case to be exceptional. *Georgia-Pacific*, 781 F.3d at 721.

Plaintiff's litigation conduct substantially increased the complexity of this case and the burden, cost, and effort required to defend it, particularly in view of the highly compressed schedule.

As an initial matter, Plaintiff commenced this action with a simultaneously filed preliminary injunction motion despite lacking the factual foundation to support its request. Plaintiff's motion not only failed to include any declarations or other evidence, but Plaintiff refused to do so, claiming its evidence would only be revealed at the preliminary injunction hearing. *See* Dkt. 41 at 7. The Court, during a telephonic conference the day before the scheduled hearing, indicated that Plaintiff's motion was lacking. *See* Ex. 2 (Oct. 27 Hr'g Tr.) at 20:17-20; *see also id.* at 15:4-18 (noting hearing was "a bit of a train wreck waiting to happen"). Yet, Plaintiff's ultimately inaccurate representations led the Court to believe that the case should be held over for an expedited trial on the merits as envisioned by Federal Rule 65(a)(ii), notwithstanding the "burdens" associated with proceeding in such "truncated" fashion. Ex. 3 (Oct. 28 Hr'g Tr.) at 8:18-32. As the Court later noted at the summary judgment hearing, that decision was made when the case "looked very different." Ex. 8 (Mar. 3 Hr'g Tr.) at 59:5-8.

Second, Plaintiff failed to comply with multiple Orders of this Court—obtained only after Defendants incurred expense filing motions to compel—by failing to produce the documents and things that they were specifically ordered to produce.

Third, in further violation of Court-ordered production deadlines and its discovery obligations, Plaintiff sought to inject new "evidence" in support of its evolving theory of its own business model that Defendants successfully moved to preclude.

Fourth, Plaintiff misled Defendants regarding Plaintiff's affiliation with and representation of certain witnesses, forcing Defendants to incur expense and waste valuable time during a fast-paced discovery schedule.

In short, Plaintiff fought to deprive Defendants of critical information while simultaneously seeking to rely on counsel's generalized assertions to the Court about that same information to prosecute its case in front of a jury. Each of Plaintiff's actions, standing alone, constitutes unreasonable litigation conduct sufficient to render the case exceptional, but even if each individual act of misconduct was insufficient on its own, the totality of the conduct squarely qualifies this case as exceptional.

### 1.      Plaintiff Refused To Comply With This Court's Orders

During the roughly three-month discovery period in this case, Defendants were forced to file two motions to compel Plaintiff's compliance with a variety of Defendants' discovery requests. *See* Dkt. 112 & 138. Each motion sought to compel Plaintiff on numerous separate issues, including (1) failure to produce documents; (2) failure to respond to interrogatory responses; (3) inconsistent interrogatory and request for admission responses; (4) refusal to produce any form of VIVE software, the existence of which its counsel repeatedly represented to the Court; (5) refusal to supply native metadata; (6) failure to produce email attachments; (7) and improper claims of privilege. Critically, despite Defendants' success on substantially all the points made in their motions to compel, Plaintiff failed to comply with the Court's Orders on these issues.

First, Plaintiff repeatedly represented to the Court that its VIVE was a free-standing software.[5] Despite a Court Order to produce a copy of that software, Plaintiff never produced a

---

[5] *See* Dkt. 291 at 4 n.5; *see also* Ex. 2 (Oct. 27 Hr'g Tr.) at 19:17-22 (indicating Plaintiff intended to demonstrate its software); Ex. 5 (Jan. 27 Hr'g Tr.) at 7:18-24 (same); *id.* at 8:2-11 (representing that "I don't think there's any question that it's a software product"). The undisputed facts have now established that Plaintiff has no free-standing VIVE software, calling into question the multiple representations detailed in Section II.B made by Plaintiff's counsel throughout the case.

VIVE software product, and never responded to follow-up requests seeking compliance with the Court's directive.

Second, Plaintiff was ordered to provide complete supplementation of its interrogatory responses signed by a corporate representative. *Id.* at 22:21–23:4. Plaintiff never provided a verification of its responses signed by a corporate representative, and admitted that it failed to timely supplement at least Interrogatory No. 9, *see* Dkt. 258 at 9, a critical request seeking "each and every fact upon which you intend to rely at trial to demonstrate that the market and/or customers for the Valador VIVE overlaps with the market and/or customers for the HTC Vive."

Third, Plaintiff was ordered to provide native metadata for specific documents requested by Defendants. *See* Ex. 6 (Feb. 17 Hr'g Tr.) at 59:20–60:20. This metadata was essential in defending against Plaintiff's ever-evolving factual theories and challenging the authenticity and veracity of key documents, yet Plaintiff provided only non-native images, the creation of which was in fact more burdensome than producing what was requested, for only certain documents and simply failed to provide anything for the remainder.

Fourth, Plaintiff was ordered to turn over all attachments to certain previously produced emails. *See id.* at 65:13-19. It failed to provide these attachments, which would have included documents reflecting the terms of Plaintiff's litigation financing and third party assessments of Plaintiff's business plans and value.

The documents and things which Defendants sought from Plaintiff, and were eventually forced to move to compel, were not inconsequential items with only tangential relevance to the issues in the case. To the contrary, Defendants judiciously sought Court intervention, bringing only the most troubling instances of Plaintiff's conduct to the Court's attention. Yet even after the Court sided with Defendants and specifically ordered Plaintiff to take certain actions,

Plaintiff did not fully comply.  To ignore Court Orders is exemplary of unreasonable litigation conduct.

### 2.    Discovery Violations Related To Its Alleged Headset Product

Defendants were forced to engage in (1) extensive, rushed discovery, (2) significant, successful motion practice, and (3) subsequent successful motion practice to uphold the discovery ruling in order to exclude Plaintiff's late disclosure of documentary and testimonial evidence related to a virtual reality headset product that Plaintiff belated alleged it had been in the process of creating for over five years, Ex. 6 (Feb. 17 Hr'g Tr.) at 46:1-10, and had been actively working to produce for retail sale by "November or December 2016," Dkt. 148 at 24, Dkt. 148-15 at 270:24–271:4.  Defendants will not burden the Court with a complete recitation of the issues, which are detailed at length in the briefing and hearing related to this issue.  *See* Dkt. 148; Dkt. 267; Ex. 6 (Feb. 17 Hr'g Tr.) at 19-56.  Suffice it to say that the Court determined that Plaintiff violated Rules 37(c)(1) and (b)(2)(A)(ii) due to Plaintiff's failure to timely disclose the purported evidence in response to any of Defendants' interrogatories and for Plaintiff's failure to timely produce documentation of that evidence following the Court's January 27, 2017 Order on Defendants' prior motion to compel.  Dkt. 283 at 2 ("[T]he magistrate judge acted properly within his discretion under Rules 37(c)(1) & (b)(2)(A)(ii)"); *see also* Dkt. 148 at 14-26.

It is worth pointing out, however, certain of Magistrate Judge Anderson's statements during the hearing on this matter, which reflect the unreasonableness of Plaintiff's litigation conduct with respect to this issue.  After an extended colloquy with Plaintiff's counsel, during which Plaintiff's counsel made a number of unsupported statements,[6] Magistrate Judge Anderson stated:

---

[6] *Compare* Ex. 5 (Feb. 17 Hr'g Tr.) at 19:17–21:13, *with* Dkt. 79-5; *see also* Ex. 6 (Feb. 17 Hr'g Tr.) at 23:8–25:23, 29:20-24, 31:1-5; 32:24–33:3, 44:12–47:16.

> You know, this . . . obviously . . . a very significant issue. It's one that it appears to me that in the deposition, if the COO was saying, we're not going into that market, <u>you as a member of the Bar should have made sure that the record was clear and that then was corrected or that information was provided</u> if on that day you in fact knew that they were actually going into the headset market. . . .
>
> But, you know, <u>this court is not a place to play hide and seek</u>. And, you know, it appears to me that if in fact the company had that as a main or as a business venture that it was planning to do—and it obviously launched—I mean, it putting something up on their Web site on February 3, and is—you know, it hasn't provided a response to the interrogatory that asked about market share, confusion, those kinds of things, I just—I don't find that allowing that evidence is fair to the defendant.

Ex. 6 (Feb. 17, 2017 Hr'g Tr.) at 49:4-20 (emphasis added). Magistrate Anderson further questioned the credibility of Plaintiff's purported plan based on the dearth of evidence to support these allegations:

> THE COURT: And to come in here and tell me that a Web site was being updated on February 2 or 3rd and I had no documents other than this one schematic that you had indicated, to produce to the other side, and the only other document that I ended up having was something that a former employee had back in 2011, just doesn't cut it.

*Id.* at 48:22-49:3.

In its objection to Magistrate Judge Anderson's ruling, Plaintiff twice admitted that it failed to supplement its interrogatory responses to disclose the precluded facts. Dkt. 258 at 11, 12. Thus, even Plaintiff admitted that its conduct was in violation of the Federal Rules of Civil Procedure.[7]

---

[7] Other examples of Plaintiff's refusal to follow the Federal Rules and Local Rules exist. For example, Plaintiff refused to provide its Rule 26(a) initial disclosures in accordance with the deadlines in the Federal Rules, *see* Dkt. 139-3, and only provided them after Defendants threatened to move to compel service, Dkt. 139-4. By way of an additional example, Plaintiff failed to timely exchange its trial exhibits, and indeed still had not provided them all by the March 3 pre-trial conference. Additionally, Plaintiff twice filed motions to compel, which it subsequently withdrew, without meeting and conferring, and in fact outright refused to meet and confer prior to filing. *See* Dkt. 256 & 256-1.

While Defendants were ultimately successful in excluding this evidence due to Plaintiff's violation of the Federal Rules, that Order was only obtained following the investment of significant time and resources to demonstrate for the Court the events unfolding in the case. Plaintiff's conduct in attempting to introduce this purported new evidence was outside the bounds of acceptable litigation conduct and warrants a finding that this case was exceptional.

### 3.    Plaintiff Misled Defendants Regarding Certain Witnesses

Plaintiff's conduct with respect to Robert Starer was unreasonable and misleading. The lengthy history associated with the obfuscation related to Mr. Starer's status as a third-party witness and the withholding of numerous communications with Mr. Starer on specious privilege grounds is set out in detail in earlier briefing and therefore is not repeated here. *See* Dkt. 139 at 5-10. It bears repeating, however, that Plaintiff not only indicated that Mr. Starer was solely a third party in its late Rule 26(a) initial disclosures and initial interrogatory responses, but also moved this Court to quash a subpoena issued to Mr. Starer without every disclosing his true status as a *de facto* member of Plaintiff's management whom Plaintiff would later designate as one of Plaintiff's Rule 30(b)(6) corporate designees. *See* Dkt. 84-85.

Plaintiff's actions created considerable discovery efforts, spurred wasted subpoena process,[8] and led to multiple motions to compel and multiple rounds of briefing on complex privilege issues upon which Plaintiff was only partially successful. *See* Dkt. 253 at 1-2 ("The court finds that plaintiff's assertion of the attorney-client privilege as to communications with Mr. Starer is not proper.")

Plaintiff's tactics regarding Mr. Starer were not an isolated instance. After learning of an additional witness and former Valador employee, Dennis Bonilla, whom Plaintiff identified in its initial interrogatory responses but failed to identify in its untimely Rule 26(a) initial disclosures,

---

[8] Plaintiff's failed to return the $284 witness fee check.

Defendants contacted Mr. Bonilla on January 12, 2017. Mr. Bonilla maintained a website containing information regarding Plaintiff's Moundsville Slammer map, which became a critical element of Plaintiff's case once Plaintiff realized that its actual business model—providing consulting services to the government—could not sustain its allegations of trademark infringement.[9] As Mr. Bonilla later testified, he immediately informed Plaintiff after being contacted by Defendants. Ex. 9 (Bonilla) at 53:2-8, 55:18-25, 57:20-58:14. Only a few days later, Plaintiff's counsel sent Defendants an email to designate corporate representatives in response to Defendants' Rule 30(b)(6) deposition, and identified Mr. Bonilla as potential witness for several topics. Two days later on January 19, 2017, Plaintiff served supplemental initial disclosures that included Mr. Bonilla and stated that he could be contacted through Plaintiff's counsel.

However, when Defendants served Mr. Bonilla with notice of deposition through Plaintiff's counsel, Plaintiff's counsel claimed that they could no longer reach Mr. Bonilla and eventually stated that he was not being represented by Plaintiff's counsel. Only six days before the noticed date for Mr. Bonilla's deposition, Plaintiff's counsel claimed for the first time that "Doug [Kahle] is obviously not a service agent for that non-party so Bonilla has not been subpoenaed." Ex. 10. Plaintiff notified Defendants of this position on February 1, 2017, only thirteen days before the close of discovery.

Due to Plaintiff's failure to secure Mr. Bonilla's attendance, Defendants independently located Mr. Bonilla in the Phoenix, Arizona-area. But when Defendants ultimately served him with a subpoena, Plaintiff's counsel was once again in contact Mr. Bonilla and even prepared him for his deposition. *See* Ex. 9 (Bonilla) at 59:23-60:9. Mr. Bonilla would later testify that,

---

[9] The next day, Mr. Bonilla's website was taken down. Fortunately, Defendants had taken screen captures of the website to preserve that evidence.

contrary to Plaintiff's counsel's representations, he had been in contact with Plaintiff multiple times after Defendants initially contacted him. *Id.* at 53:2-8, 55:18-25, 57:20-58:14. Mr. Bonilla's sworn testimony directly contradicts the statements by Plaintiff's counsel that they were not in contact with him.

Plaintiff's obfuscation regarding Mr. Bonilla required Defendants to expend unnecessary resources locating Mr. Bonilla and preparing and serving him with a subpoena. Further, Plaintiff's misleading conduct unnecessarily delayed Mr. Bonilla's deposition, which forced Defendants to make last minute arrangements to conduct Mr. Bonilla's deposition before the close of discovery and impacted Defendants trial preparation.

Both instances independently evidence Plaintiff's unreasonable litigation conduct.

### 4.    Plaintiff Twice Changed its Website to Support its Claims

Plaintiff's litigation misconduct extended to manipulating its own website in an apparent attempt to manufacture more favorable facts to support its allegations of market overlap with Defendants. Plaintiff twice altered its website after filing the litigation: the first time to prominently promote Plaintiff's VIVE development environment and the second time to attempt to promote something entirely different—Plaintiff's purported virtual reality headset—while at the same time stripping all references to the previously touted development environment.

Plaintiff first altered it website after it filed suit. As the Court found in its summary judgment opinion, "Before this litigation, [Plaintiff's] website did not display the word 'VIVE' on its main page." Dkt. 291 at 5. And it was not until "[a]fter plaintiff filed its lawsuit, [that] plaintiff altered its website to feature prominently the unstylized, hyperlinked word 'VIVE' on the main page." *Id.* After Plaintiff altered its website at the beginning of this lawsuit, the link on the main page led to a subpage containing information about Plaintiff's VIVE development environment that also did not exist prior to this lawsuit. *Id.*

Plaintiff's first alteration, however, did not last long.  Plaintiff altered its website a second time on February 3, 2017, two days after the Court had ordered Plaintiff to produce all its discovery.  This time Plaintiff removed all references to the VIVE development environment and replaced them with a picture of its purported virtual reality headset under the heading "VIVE Virtual Reality Headset," which led to an entirely new page containing only information about the purported headset.  *See* Dkt. 196-2 at VIVE 006003-04.

Plaintiff's changes to its website were litigation-driven and represent the very type of conduct that this Court should discourage.  Plaintiff's first website alteration conveniently allowed Plaintiff to argue that it advertised its VIVE mark on the Internet, a fact which Plaintiff relied upon heavily in seeking preliminary injunctive relief.  *See* Dkt. 11 at 9.  Plaintiff's second update occurred in an attempt to create new evidence of purported market overlap.

Plaintiff's multiple litigation-driven attempts to introduce new "evidence" during the pendency of this lawsuit constitute conduct which undermines the machinery of justice.  Combined with Plaintiff's ever-evolving theory of its own business, Plaintiff's creation of a moving target imposed unnecessary burden and expense on Defendants and the Court.  Plaintiff's conduct was unreasonable and renders this case exceptional.

## III.    DEFENDANTS' ATTORNEYS' FEES ARE REASONABLE

The Court has discretion to determine the amount of reasonable attorneys' fees for exceptional cases.  *Synthon IP, Inc. v. Pfizer Inc.*, 484 F. Supp. 2d 437, 444 (E.D. Va. 2007), aff'd, 281 Fed. App'x 995 (Fed. Cir. 2008) (citing *Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1458 (Fed. Cir. 1984).  The lodestar amount is "[t]he most useful starting point for determining the amount of a reasonable fee."  *Id.*  The lodestar theory dictates that "the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Allora, LLC v. Cambridge Builders of Johnston Cty.*,

*Inc.*, 532 Fed. App'x 349, 352 (4th Cir. 2013) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)).[10]  "The Supreme Court of the United States . . . has stated that there is a 'strong presumption' that the lodestar figure represents a reasonable attorneys' fee award, which may be overcome only 'in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee.'"  *Virginia-Pilot Media Cos., LLC v. Dep't of Justice*, Civ. No. 2:14-cv-577, 2016 WL 4265742, at *2 (E.D. Va. Aug. 10, 2016) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553-54 (2010)).

Further, the Court may adjust the amount reasonable fees based on the twelve *Johnson* factors adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

577 F.2d 216, 226, n.28 (4th Cir. 1978).  However, "it is important to remember that '[a] request for attorney's fees should not result in a second major litigation.'"  *Synthon*, 484 F. Supp. 2d at 444 (E.D. Va. 2007) (citing *Hensley*, 461 U.S. at 437).

## A.    Defendants Only Seek Recovery For Hours Reasonably Expended On This Case At Reasonable Rates

This case directly threatened HTC's ability to pursue a new product line in an emerging technology at the critical fourth quarter holiday sales period.  Plaintiff's claims in this case

---

[10]    Courts also typically subtract fees for time spent on unsuccessful claims unrelated to the successful claims, *Two Men and a Truck/Int'l*, 128 F. Supp. 3d at 924; however, because Defendants successfully defended against all of Plaintiff's claims here, this consideration is not relevant.  To the extent that the Court's refusal to permit Defendants to amend their answer to include counterclaims against Plaintiff renders such effort an "unsuccessful claim," Defendants are not requesting attorneys' fees for such work.

sought to enjoin HTC from use of the HTC Vive brand name, in which HTC had already heavily invested to advertise and promote its product.  *See* Dkt. 291 at 7.  The impact of the requested injunction, while difficult to truly assess, would not only have resulted in severe monetary losses, but also would have significantly impaired HTC's ability to compete in the emerging virtual reality hardware market.  *See* Dkt. 36-2 at ¶¶ 60-71.[11]  Plaintiff also sought the equitable remedy of the disgorgement of HTC's profits in connection with the HTC Vive.  In view of the gravity of the relief sought, Defendants now seek reimbursement for the successful defense of Plaintiff's claims against three different entities in the amount of $1.5 Million in attorneys' fees. Defendants do not seek reimbursement for non-taxable costs, such as expert witness fees, travel expenses, and e-discovery fees.

As detailed herein and in the accompanying declaration of lead counsel, Defendants seek reimbursement for a portion of the following attorneys' fees after reasonable reductions:

| Attorney | Billed Hours | Hourly Rate | Billed Amount |
|---|---|---|---|
| Ahmed, Salsabil | 645.65 | $325 | $209,836.25 |
| Ball, David J | 914.9 | $500 | $457,450.00 |
| Geiger, Timothy R | 892.6 | $325[12] | $290,095.00 |
| Hennessy, Erin S | 262.1 | $485 | $127,118.50 |
| Morgan, Melissa A | 468.3 | $325 | $152,197.50 |
| Ruzow, Ben | 499.2 | $325 | $162,240.00 |
| Stewart, Doug | 469.7 | $500 | $234,850.00 |
| **Subtotal** | **4,152.45 hrs** | | **$1,633.787.25** |
| Add'l Reductions | (617.7 hrs) | | ($130,877.30) |
| **TOTAL** | **3,534.75** | | **$1,502,909.95** |

---

[11] The gravity of the relief sought supports the amount of attorney's under the eighth *Johnson* factor ("the amount in controversy and the results obtained").

[12] Tim Geiger, who is a sixth year associate, was billed at $385 per hour.  However, his rate for purposes of this fee request has been reduced to $325 per hour to conform with all other associate rates.

The above work spans from the filing of this lawsuit on September 16, 2016, through March 1, 2017. Although counsel continued significant work on this case through the dispositive motion hearing on March 3, 2017, those amounts have not been included in the above table because the fee invoices for March have not yet been completed. These amounts, which are already based on discounted rates and include substantial deductions from total amount billed in connection with this matter, are reasonable as explained further below.

### 1.    Defendants' Hours Billed Were Reasonable

Plaintiff asserted Lanham Act claims for trademark infringement, unfair competition, and cybersquatting (dismissed except for HTC Corp.), and Virginia state law claims for civil conspiracy and statutory conspiracy (both dismissed) against four different defendants (one of which was dismissed), all represented by the same counsel.[13] Defendants' successfully obtained summary judgment on all claims and, for the reasons stated above, this was not a close case. *See Barber*, 577 F.2d at 226, n.28 ("(8) the amount in controversy and the results obtained").

This case proceeded on an exceptionally fast schedule, and Plaintiff's unreasonable litigation conduct made discovery and motion practice in this case particularly complicated and expensive.[14] Plaintiff attempted three different iterations of its case within a five and half month period, requiring extensive discovery to disprove each of the various iterations. *See* Dkt. 203 at 4-10; Dkt. 267 at 1-3; Ex. 11 (Stewart Decl.) at ¶¶ 5-16. To build the factual record to refute each of the various iterations, Defendants took six depositions of Plaintiff's fact witnesses and corporate representatives, one of which extended multiple days due to the witnesses health constraints. *Id.* at ¶ 12. Defendants took two more third-party depositions and defended three

---

[13] Even grouping the two HTC entities together, the pro-rata share of attorneys' fees per party is a little less than $750,000 per defendant.

[14] The work outlined in this section bears on *Johnson* factor no. 1, "the time and labor required to litigate the suit." *Barber*, 577 F.2d at 226, n.28.

more depositions of their own witnesses.  *Id.*  Further, Defendants were required to serve twelve sets of written discovery to gather evidence to refute Plaintiff's ever-evolving factual allegations and resolve Plaintiff's inconsistent discovery responses.  *Id.* at ¶ 13.  Moreover, Defendants were required to respond to twenty-one sets of requests for production, interrogatories, and requests for admission served by Plaintiff.  *Id.*

Plaintiff's failure to comply with its basic discovery obligations required Defendants to file two motions to compel discovery, supplemental briefing regarding Defendants' motion to compel Robert Starer's communications improperly withheld on the basis of attorney-client privilege, a motion to preclude Plaintiff's last-minute attempt to introduce evidence of a purported plan to market its own virtual reality headset branded with the word VIVE, and a response to Plaintiff's objection to Magistrate Judge Anderson's ruling on that issue.

Additionally, at the outset, this case required Defendants to defend against Plaintiff's motion for preliminary injunction.  As the Court indicated on the October 27, 2016 telephonic conference, Plaintiff motion for preliminary injunction was not supported with sufficient evidence.  *See* Ex. 2 (October 27, 2017 Hr'g Tr.) at 15:12-15.  However, despite the lack of evidence submitted by Plaintiff, Defendants were still required to prepare a thorough opposition to Plaintiff's motion due to the potential severe impact of the requested injunction on HTC's business during the first-ever holiday sales season for the HTC Vive.  *See id.*at 15:4-11; Dkt. 36-2 at ¶¶ 60-71.  Defendants submitted three declarations and numerous supporting exhibits, totaling one-hundred and forty pages, in opposition to Plaintiff's motion for preliminary injunction.  *See* Dkt. 36-1 thru 36-3.

At the early stages of the case, Defendants were also successful in moving to dismiss seventeen claims from this lawsuit, including all five claims asserted against the non-operational

subsidiary HTC Vive Tech, Inc.  Dkt. 74 & 118.  Eight of the seventeen claims were dismissed a second time when Plaintiff re-alleged them its Second Amended Complaint.  *Id.*  Ultimately, Defendants' motions to dismiss Plaintiff's First Amended Complaint and Second Amended Complaint for failure to state a claim succeeded in eliminating thirteen claims from this lawsuit. Therefore, this work was not only reasonable and necessary, but it streamlined the proceedings and reduced the overall amount of attorneys' fees from what it otherwise would have been. Because not all of Plaintiff's claims were Lanham Act claims, Defendants are only requesting fifty percent of their fees incurred in connection with their motions to dismiss for the reasons explained further below.

Further, the expedited schedule in this case required Defendants to fully prepare their case for trial before Defendants could be heard on their motion for summary judgment.[15]  The dispositive motion hearing was held on March 3, 2017, on the eve of the March 7, 2017 trial setting. Dkt. 46.  Moreover, time limitations caused by the compressed deadlines for the close of discovery (fact and expert), dispositive motions, motions to exclude experts, and pretrial filings—all of which were set between February 14, 2017 and February 21, 2017—and the trial setting only a few weeks later on March 7, 2017, required considerable work and an expanded case team to meet the various deadlines and conduct overlapping depositions of Plaintiff's witnesses during the first half of February.  The difficulty in meeting these deadlines was further compounded by Plaintiff's attempt to introduce evidence of its purported headset during the first

---

[15] The expedited case schedule supports the amount of work under *Johnson* factor nos. 4 ("the attorney's opportunity costs in pressing the instant litigation") and 7 ("the time limitations imposed by the client or circumstances").  *Barber*, 577 F.2d at 226, n.28; *see also In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. MDL 05-1708 DWF/AJB, 2011 WL 6056463, at *2 (D. Minn. Dec. 6, 2011) (noting that a fast-paced multi-district litigation precluded the firms from working on other cases).

week of February, requiring Defendants to prepare and file a motion to preclude this purported evidence on February 9, 2017.  *See* Dkt. 148.

The work of defense counsel is further detailed in counsel fee statements submitted with the accompanying declaration of lead counsel.  Ex. 11 (Stewart Decl.) at ¶¶ 21-37.  Significantly, counsel's invoices do not include block billing, and instead identify the amount of time billed on a per task basis in accordance with the billing codes identified in the attached fee statements.  *Cf. Two Men & A Truck/Int'l, Inc. v. A Mover Inc.,* 128 F. Supp. 3d 919, 929 (E.D. Va. 2015) (applying a 10% reduction in fees due to inability to separate block entries into constituent tasks).  Accordingly, in view of the extensive work required within the expedited case schedule, Defendants' attorneys' fees were reasonable and necessary.

### 2.    Defense Counsel's Hourly Rates Were Reasonable

The hourly rates billed by counsel were between $485 and $500 per hour for partners, and $325 associates.  At the outset, Defendants' counsel provided a significant discount in their normal market rates due, in part, to the long-standing relationship that Bracewell has with HTC. *See* Ex. 11 (Stewart Decl.) at ¶¶ 3, 38; *Barber*, 577 F.2d at 226, n.28 (*Johnson* factor no. 11, "the nature and length of the professional relationship between attorney and client").  Defendants have submitted the affidavit of Bernard J. DiMuro attesting to the fact that these discounted rates are within the range of reasonable rates for trademark matters in northern Virginia.  Affidavit of Bernard J. DiMuro attached as Exhibit 12.

Further, the hourly rates of Defendants' counsel are well-within the rates applied by courts in the Alexandria division and other divisions the Eastern District of Virginia.  For example, in *Taylor v. Republic Servs.*, *Inc.*, a case decided in January 2014, the court applied the *Vienna Metro* Matrix for "2011 Range of Hourly Rates in Northern Virginia" to determine the reasonableness of rates in the Alexandria division  No. 1:12-CV-00523, 2014 WL 325169, at *3

(E.D. Va. Jan. 29, 2014). The average hourly rates would from to be: $250-435/hr for 1-3 years of experience; $350-600/hr for 4-7 years of experience; $465-640/hr for 8-10 years of experience; $520-770/hr for 11-19 years of experience; and $505-820/hr for 20+ years of experience. *Id.* Even though the *Vienna Metro* Matrix is based on rates that are now six years old, the hourly rates charged by counsel in this case are at the lower end of the spectrum, or in many cases below, the ranges set forth in the *Vienna Metro* matrix. For example, Erin Hennessy ($485) has been practicing law for 20 years, yet her rate is below the rates charged for lawyers of their experience according to the matrix. Similarly, Doug Stewart ($500) and David Ball ($500) are below the applicable market rate in the *Vienna Metro* matrix for lawyers with between 11 and 19 years of experience. Ben Ruzow ($325), who has 8 years of experience, and Tim Geiger ($325), who has 5 years of experience, are also below their respective ranges. And junior associates Ms. Morgan and Ms. Ahmed (all $325) are slightly on the low end of the spectrum.

The reasonableness of the hourly rates charged in the case is further confirmed by decisions from other divisions within the Eastern District of Virginia. *See Two Men & A Truck/Int'l*, 128 F. Supp. 3d at 927 (considering evidence of prevailing rates for trademark matter: "attorneys with more than 25 years of experience ($500 to $800 an hour); attorneys with five years of experience ($325 to $450 an hour); and paralegals with more than 25 years of experience ($200 to $300 an hour)"); *Virginia-Pilot Media Companies, LLC v. Dep't of Justice*, No. 2:14-CV-577, 2016 WL 4265742, at *4 (E.D. Va. Aug. 10, 2016) (collecting cases awarding $420-600/hr for partners or experienced, and $250-400/hr for associates). Accordingly, the hourly rates billed were reasonable. *See Barber*, 577 F.2d at 226, n.28 (*Johnson* factors nos. 5 ("the customary fee for like work") and 12 ("attorneys' fees awards in similar cases")).

### B.      Defendants Have Applied Reasonable Reductions

Over the course of the case and again in connection with this motion, Defendants' counsel reviewed time records for the work performed and deleted charges for anything judged to be unnecessary or excessive.  Ex. 11 (Stewart Decl.) at ¶ 31.  Defendants do not seek reimbursement for any of those fees, which have already been excluded from this fee application.[16]   Additionally, Defendants are not seeking reimbursement of any of their non-taxable cost, including significant expert fees and travel costs.  Nor did counsel bill for any of its travel time in this matter.  *See Two Men*, 128 F. Supp. 3d at 928 (holding that travel time may be awarded at a reduced rate within the discretion of the court).

Further, Defendants' request for attorneys' fees is limited to the core litigation team, consisting of Bracewell partners Doug Stewart, Erin Hennessey, and David Ball, and Bracewell associates Ben Ruzow, Tim Geiger, Melissa Morgan, and Salsabil Ahmed.  Ex. 11 (Stewart Decl.) at ¶ 25. (As noted above, Tim Geiger's hourly rate was reduced further resulting in an additional $53,556 reduction in fees.)

Defendants do not seek reimburse for other attorneys who assisted with the case.  Although these individual's work on the case was integral to the defense, Defendants have excluded all fees for twelve other team members who, for example, conducted a single deposition of a third-party due to their proximity to the deposition location, provided only supporting research assistance, or were brought on only to assist with preparation of proposed jury instructions.  Defendants also do not seek paralegal fees.  *Id.* at ¶¶ 25-27.  These attorneys represent $242,694.00 in fees.  *Id.*

---

[16]  In accordance with responsible billing practices, Defendants' counsel has already reduced the amount billed to the client by approximately $160,000.  Ex. 11 (Stewart Decl.) at ¶ 37.

Further, Defendants are not seeking the attorneys' fees billed by its local counsel, Charles Sims and Michael Barnsback, who were retained several months into the case, even though those individuals are highly experienced and were integral to the substantive preparation of this case, including motion drafting, presenting oral argument, and trial preparation. This represents an additional reduction of $45,487.50 in attorneys' fees. *Id.* at ¶ 36.

Defendants have also applied significant additional reductions for specific work performed. Specifically, Defendants have excluded fifty percent of the fees incurred in connection with their motions to dismiss Plaintiff's first and second amended complaints for failure to state a claim and lack of personal jurisdiction because that work also related in part to Plaintiff's state law conspiracy claims. Because two of the five claims originally asserted against Defendants were state law conspiracy claims, Defendants have conservatively reduced their fees for these motions by fifty percent, resulting in a further reduction of $118,024.80 in fees. *Id.* at ¶ 32. Defendants have also excluded fees incurred in connection with discovery sought from Plaintiff's litigation financier, LexShares, because this discovery was not ultimately used by Defendants. Ex. 10 (Stewart Decl.) at ¶ 33. This is an additional $12,852.50 in fees for a total additional reduction of $130,877.25 as shown in the table above. *Id.* at ¶¶ 33-34.

In sum, Defendants have applied reasonable reductions to their fees billed in the amount of $472,614.80, which represents an approximately 24% reduction in the fees billed. *Id.* at ¶ 37.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's claims were objectively meritless and should never have been brought.  Further, Plaintiff litigated this case in an unreasonable manner, whether by creating litigation-driven evidence or disregarding basic discovery obligations, necessitating multiple motions to compel discovery and a motion to preclude evidence.  Accordingly, Plaintiff's conduct in this case renders this case exceptional, and Defendants should be awarded their attorneys' fees.

Dated:   March 31, 2017                              Respectfully submitted,

                                        */s/ Charles M. Sims*
                                      Charles M. Sims (VSB No. 35845)
                                      O'HAGAN MEYER PLLC
                                      411 East Franklin St., Suite 500
                                      Richmond, VA 23219
                                      Telephone:  (804) 403-7111
                                      Facsimile:  (804) 237-0250
                                      Email:  csims@ohaganmeyer.com

                                             and

                                      Douglas F. Stewart (admitted *pro hac vice*)
                                      BRACEWELL LLP
                                      701 5th Avenue, Suite 6200
                                      Seattle, Washington  98104-7018
                                      Telephone:  (206) 204-6200
                                      Facsimile:  (800) 404-3970
                                      Email:  doug.stewart@bracewelllaw.com

                                             and

                                      David J. Ball (admitted *pro hac vice*)
                                      Erin S. Hennessy (admitted *pro hac vice*)
                                      BRACEWELL LLP
                                      1251 Avenue of the Americas, 49th Floor
                                      New York, New York  10020-1100
                                      Telephone:  (212) 508-6100
                                      Facsimile:  (800) 404-3970
                                      Email:  david.ball@bracewelllaw.com
                                      Email:  erin.hennessy@bracewelllaw.com

and

Britt Cass Steckman (VSB No. 80966)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone:  (202) 828-5831
Facsimile:  (800) 404-3970
Email:  britt.steckman@bracewelllaw.com

**_Counsel for Defendants_**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of March 2017, a true and complete copy of the foregoing *Memorandum In Support of Motion for Attorneys' Fees* has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

  /s/ Charles M. Sims
Charles M. Sims (VSB No. 35845)
O'HAGAN MEYER PLLC
411 East Franklin St., Suite 500
Richmond, VA 23219
Telephone:  (804) 403-7111
Facsimile:  (804) 237-0250
Email:  csims@ohaganmeyer.com
