IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

VALADOR, INC.,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civil Action No. 1:16cv1162 (TSE/JFA)
                                        )
HTC CORPORATION, *et al.*,              )
                                        )
            Defendants.                 )
_____)

## PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS

Pursuant to an order of referral from the District Judge (Docket no. 314), this matter is

before the court on defendants' motion requesting an award of attorney fees in the amount of

$1,502,909.95 (Docket no. 302) and a bill of costs in the amount of $29,852.28 (Docket no. 298).

Pursuant to 28 U.S.C. § 636(b)(1)(C), the undersigned magistrate judge is filing with the court

his proposed findings of fact and recommendations, a copy of which will be provided to all

interested parties.

### Procedural Background

On September 16, 2016, plaintiff Valador, Inc. filed a complaint against defendants HTC

Corporation and Valve Corporation (Docket no. 1), along with a motion for preliminary

injunction that was noticed for a hearing on September 30, 2016. (Docket nos. 4, 6). On

September 26, 2016, the court cancelled the hearing on plaintiff's motion for preliminary

injunction and ordered plaintiff to reschedule the hearing on the motion after serving the

complaint and motion for preliminary injunction on defendants and allowing them a reasonable

opportunity to respond to the motion. (Docket no. 8). On September 30, 2016, plaintiff filed an

amended complaint against defendants HTC Corporation ("HTC Corp."); HTC America, Inc.

("HTC America"); HTC Vive Tech (US) Corp. ("HTC-VT"); and Valve Corporation[1] ("Valve")
alleging (1) infringement of a federally registered trademark (15 U.S.C. § 1114), (2) unfair
competition and false designation of origin (15 U.S.C. § 1125(a)), (3) a violation of the Anti-
Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), (4) Virginia common law
conspiracy, and (5) Virginia statutory conspiracy (Va. Code §§ 18.2-499, 18.2-500). (Docket no.
9). Plaintiff also filed an amended motion for preliminary injunction against those same
defendants that was noticed for a hearing on October 28, 2016. (Docket no. 10, 12). On October
24, 2016, Valve filed a motion to dismiss the amended complaint (Docket no. 24) and all
defendants filed a comprehensive opposition to the amended motion for a preliminary injunction
supported with three declarations. (Docket no. 36).

Following a telephone conference on October 27, 2016 and a hearing on October 28,
2016, the court consolidated the hearing on plaintiff's motion for preliminary injunction with the
trial on the merits and set the pretrial schedule, including a hearing on summary judgment
motions for March 3, 2017 and a trial on March 7, 2017. (Docket no. 46). On October 31, 2016,
HTC-VT filed a motion to dismiss the amended complaint for lack of jurisdiction and failure to
state a claim (Docket no. 48), and on November 1, 2016, HTC America and HTC Corp. also
filed motions to dismiss the amended complaint for lack of jurisdiction and failure to state a
claim (Docket nos. 51, 54). On December 2, 2016, the court dismissed the fourth and fifth
counts against HTC Corp. and dismissed all counts against the remaining defendants. (Docket
no. 74).

On December 20, 2016, plaintiff filed a second amended complaint against HTC Corp.,
HTC America, and Valve (collectively "defendants"), alleging (1) infringement of a federally

---

[1] All of the defendants are represented by counsel bringing the present motion for attorney's fees,
Bracewell LLP and local counsel O'Hagan Meyer PLLC.

registered trademark (15 U.S.C. § 1114), (2) unfair competition and false designation of origin (15 U.S.C. § 1125(a)), (3) a violation of the Anti-Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), (4) Virginia common law conspiracy, and (5) Virginia statutory conspiracy (Va. Code §§ 18.2-499, 18.2-500). (Docket no. 79). On January 6, 2017, HTC Corp., HTC America, and Valve filed a motion to dismiss counts 3–5 of the second amended complaint for failure to state a claim. (Docket no. 106). On January 13, 2017, the court dismissed the third count as to HTC America and Valve, and dismissed the fourth and fifth counts as to all defendants. (Docket no. 118).   On January 27, 2017, defendants filed answers to the second amended complaint. (Docket nos. 131–33).

   As provided in the court's expedited schedule, on February 14, 2017, the parties filed cross-motions for summary judgment that were noticed for a hearing on March 3, 2017. (Docket nos. 175–76, 179–80). On February 17, 2017, the undersigned magistrate judge ordered that plaintiff could not "use or in any way refer to any actual or potential development, plans, advertising, promotions, offers for sale, or sales of headsets or other virtual reality hardware" (Docket no. 207), which plaintiff objected to on February 24, 2017 (Docket no. 257).   On March 3, 2017, the District Judge overruled plaintiff's objection to the undersigned's ruling. (Docket no. 283).   On the same day, the court took the motions for summary judgment under advisement and postponed the trial that was scheduled to begin the following week pending resolution of those motions. (Docket no. 281).

   On March 15, 2017, the court entered an order granting defendants' motion to exclude the reports, opinions, and testimony of plaintiff's survey expert (Docket no. 290) and a separate order denying the plaintiff's motion for summary judgment and granting the defendants' motion for summary judgment (Docket no. 293). On March 17, 2017, the Clerk of Court entered

3

judgment in favor of defendants and against plaintiff pursuant to Federal Rule of Civil Procedure 58. (Docket no. 295). On March 28, 2017, defendants filed a bill of costs (Docket no. 298), and on March 31, 2017, defendants filed their motion for attorney fees. (Docket no. 302). On March 29, 2017, plaintiff filed a notice of appeal (Docket no. 299) and on April 3, 2017, the court stayed defendants' motion for attorney fees pending resolution of plaintiff's appeal (Docket no. 305).

On December 22, 2017, the Fourth Circuit issued its decision affirming the judgment of the district court. (Docket no. 309). The Fourth Circuit issued the formal mandate on January 18, 2018. (Docket no. 310). On March 5, 2018, the court directed plaintiff to file any response to defendants' motion for attorney fees and scheduled a hearing for April 6, 2018. (Docket no. 311). Plaintiff filed an opposition to the motion for attorney fees on March 20, 2018 (Docket no. 312) and defendants filed a reply on March 26, 2018 (Docket no. 313). On April 3, 2018, an order was entered referring the motion for attorney fees to the undersigned magistrate judge (Docket no. 314) and the hearing was reset for May 4, 2018 (Docket no. 315). On April 17, 2018, the plaintiff filed a response to the court's April 9, 2018 order attaching a copy of various pleadings, disclosures, transcripts, and orders. (Docket no. 316).

On May 4, 2018, counsel for the parties appeared before the undersigned and presented argument on the motion for attorney fees. (Docket no. 317).

## Proposed Findings and Recommendations

Following the filing of three versions of the complaint requiring two separate motions to dismiss, all of the claims against HTC-VT were dismissed, the conspiracy claims in Counts IV and V were dismissed against all defendants, and the Anti-Cybersquatting Consumer Protection Act count against defendants HTC America and Valve was dismissed. After extensive briefing

and argument, the court granted defendants' motion for summary judgment on the remaining

three counts: (1) infringement of a federally registered trademark (15 U.S.C. § 1114), against all

defendants; (2) unfair competition and false designation of origin (15 U.S.C. § 1125(a)), against

all defendants; and (3) a violation of the Anti-Cybersquatting Consumer Protection Act (15

U.S.C. § 1125(d)), against HTC Corp. (Docket no. 293). The court explained its decision in a

detailed 33 page memorandum opinion. (Docket nos. 291, 292) On appeal, the Fourth Circuit

held that the district court did not err in its orders granting sanctions against plaintiff disallowing

the introduction of certain evidence (Docket no. 283) and excluding plaintiff's survey expert

(Docket no. 290), and affirmed the district court's judgment granting summary judgment

adopting "the carefully crafted and well-reasoned Summary Judgment Decision in favor of the

defendants." (Docket nos. 308, 309).

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney

fees to the prevailing party." 15 U.S.C. § 1117(a). In the Fourth Circuit, "a district court may

find a case 'exceptional' and therefore award attorney fees to the prevailing party under §

1117(a) when it determines, in light of the totality of the circumstances, that (1) there is an

unusual discrepancy in the merits of the positions taken by the parties, based on the non-

prevailing party's position as either frivolous or objectively unreasonable; (2) the non-prevailing

party has litigated the case in an unreasonable manner; or (3) there is otherwise the need in

particular circumstances to advance considerations of compensation and deterrence." *Georgia-*

*Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015) (citing

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014)). The Fourth

Circuit recently affirmed the use of the *Georgia-Pacific* standard in a Lanham Act action where

the defendant was seeking an award of attorney fees against a plaintiff, stating that a prevailing

party (1) need only prove an exceptional case by a preponderance of the evidence and (2) need not establish that a losing party's conduct was independently sanctionable or taken in bad faith in order to merit an award of attorney fees under the Lanham Act. *Verisign, Inc. v. XYZ.COM LLC*, 2018 WL 2407644, at *1, *5 (4th Cir. May 29, 2018).[2]

As an initial matter, defendants are clearly the "prevailing party" as defined by section 1117(a) given that their motions to dismiss and motion for summary judgment were successful and ultimately affirmed on appeal. Defendants advance two arguments in support of their argument that this is an exceptional case: (1) plaintiff's claims lacked any substantive merit, and (2) plaintiff's litigation conduct was unreasonable. (Docket no. 303 at 7–24). The undersigned considers each of these arguments in turn.

1. Plaintiff's Claims Lacked Substantive Merit

Under the *Georgia-Pacific* framework, a case may be considered "exceptional" when "there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable." *Georgia-Pacific*, 781 F.3d at 721. Notably, the non-prevailing party's claims need not be objectively unreasonable at the time of filing, but can become so over the course of the litigation. *Design Res., Inc. v. Leather Indus. of Am.*, 2016 WL 5477611, at *4 (M.D.N.C. Sept. 29, 2016) (citing *Georgia-Pacific*, 781 F.3d at 720). Moreover, "[s]hould a position, even if previously not within the purview of exceptional behavior, migrate to a questionable classification, a party has the responsibility to react and respond accordingly. Thus, a party should continue to evaluate the reasonableness of its litigation strategy as the case progresses to ensure that conduct does not

---

[2] Plaintiff argues that the *Georgia-Pacific* standard is a "glaring departure" from Fourth Circuit precedent with "much left to debate," and therefore should not be applied to the present case. (Docket no. 312 at 10). Regardless of plaintiff's disagreements with the Fourth Circuit's decision, this court is bound by the decisions of the Fourth Circuit.

cross the line from reasonable to questionable." *Id.* at \*4 (citing *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 482–83 (Fed. Cir. 2016); *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1310–11 (Fed. Cir. 2013)).

While plaintiff argues it had a basis to suspect violations of the Lanham Act when it filed the initial complaint since it had a valid registration for the VIVE mark, the record shows that its position became objectively unreasonable as soon as the litigation got started. Following the filing of its amended motion for preliminary injunction, the court noted in a pre-hearing conference call on October 27, 2016, that a hearing on the motion appeared to be premature and warned the plaintiff that "just because you have identical marks doesn't mean there is infringement," that "the keystone of infringement is the likelihood of confusion", "if they're not doing the same business, then there may not be a basis for concluding that there is irreparable harm," and "controlling law puts great emphasis on likelihood of confusion and whether the markets are related." (Docket no. 59 at 10:1–13, 20:8–10). Given the state of the record at the time and with the parties' agreement, the court consolidated plaintiff's amended motion for preliminary injunction with the trial on the merits, providing plaintiff with additional time to provide substantive evidentiary support for its claims. (Docket no. 46). As forth in the October 28, 2016 Order, an expedited schedule was set providing approximately 100 days for discovery, setting a February 14, 2017 deadline for filing dispositive motions, a hearing on dispositive motions on March 3, 2017, and the trial was to begin the following week on March 7, 2017. (*Id.*)

As discovery progressed, the weaknesses in plaintiff's claims became clearer, beginning with its attempt to establish market overlap. In its amended complaint, plaintiff stated that it "offers high level, complex technical and computer products and consulting services to governmental agencies and commercial enterprises, especially through 3D and virtual reality

computer modeling and simulation solutions." (Docket no. 9, ¶ 1). During the pre-hearing conference on plaintiff's amended motion for preliminary injunction, plaintiff's counsel stated that Valador's owner could testify that plaintiff's VIVE program "uses a gaming engine to present immersive 3D virtual reality results . . . [to] show people like NASA in a visual way his computer answers to their problems," and that "the only difference in what [the plaintiff does] and what [defendants] are doing is that they tend to want to show their virtual reality product through head goggles," which Valador could do just as easily if it wanted to. (Docket no. 59 at 12:21–13:5). Despite the overwhelming weight of evidence to the contrary, plaintiff then repeatedly asserted that its VIVE product was a software product sold to customers. (Docket no. 291 at 4 n.5). This assertion was unsupported by any record evidence, and was rebutted by plaintiff's own employees during depositions. (*Id.*). Plaintiff then attempted to bolster its claim that it produced stand-alone software by stating that it offered some "Moundsville Slammer" video game maps for free download in 2010. (Docket no. 291 at 4–5, 20). However, the court found that the video game maps were not branded or labeled in any way with the VIVE mark, they were created pursuant to a contract with Valve, and plaintiff never independently sold the video game maps because it was contractually prohibited from doing so. (*Id.*).

Prior to the filing of this lawsuit, the website plaintiff maintained at <www.valador.com> did not display the word VIVE on its main page. (Docket no. 291 at 5). After the filing of the lawsuit, the plaintiff altered its website to feature the unstylized, hyperlinked word "VIVE" on the main page that, when clicked, would redirect the user to a subpage containing information about plaintiff's VIVE development environment that did not exist prior to the lawsuit. (*Id.*). The plaintiff's then used this after the filing of the lawsuit alteration to argue that the VIVE mark was being used to advertise on the Internet. (Docket no. 11 at 9).

Near the end of the discovery period plaintiff again shifted its approach and attempted to introduce evidence that it was providing virtual reality headsets branded with the word "VIVE" as evidenced by three scanned images produced on February 1, 2017. (Docket nos. 148 at 12, 148-10). Plaintiff also produced a rendering of a headset on January 25, 2017, and altered its website on February 3, 2017 to include an item regarding the "VIVE Virtual Reality Headset." (Docket nos. 148 at 12, 243 at 41:14–42:1). At the hearing on defendants' motion to preclude the admission of evidence regarding the headset, plaintiff's counsel claimed that this was "no new program on the part of Valador," despite admitting that they first produced evidence of the headset in late-January 2017. (Docket no. 243 at 19:5–25). Plaintiff also represented that the rendering produced on January 25, 2017 was "generated in connection with a potential process patent application," devoid of a description or a broader business plan. (Docket no. 243 at 19:17–20:12). When pressed as to why these headsets were not disclosed in earlier interrogatory responses, plaintiff's counsel fumbled for an explanation, at first claiming that there were discussions of "entering into the video gaming business back in 2010," then stating that plaintiff was "an ongoing business," but that "securing of the headset [wasn't] a novel thought that came up the last few days." (Docket no. 243 at 21:14–22:17). Plaintiff's counsel then pointed to a declaration filed as part of its opposition to defendants' motion to preclude—rather than as part of the summary judgment briefings—claiming that the photograph was taken in 2011, but was only produced on February 8, 2017 because it was in the possession of an ex-employee. (Docket no. 243 at 25:2–8). Finally, plaintiff's counsel justified the belated website update by claiming that "[Valador] are in business, they continue to update their Web site," and that the "latest update to the Web site was provided immediately, again before any sort of fact cutoff discovery." (Docket no. 243 at 26:5–10).

9

After considering the pleadings and arguments presented, the court found that the record did not support plaintiff's contention that the recent disclosures relating to offering a competing headset with the VIVE mark was anything other than litigation oriented conduct. (Docket no. 243). Plaintiff failed to describe any such business plan to sell a VIVE branded virtual reality headset in its earlier pleadings or arguments with the court and it failed to provide that information in response to discovery requests until the very end of the discovery period. The sparse nature of the belated documents that were produced and the fact that plaintiff's own expert did not take into consideration this new business venture also support the conclusion that this was not an actual business effort on plaintiff's part but a belated attempt to provide evidence to support an otherwise unsupportable claim. Following the hearing, the court issued an order holding that "[p]laintiff may not use or in any way refer to any actual or potential development, plans, advertising, promotions, offers for sale, or sales of headsets or other virtual reality hardware." (Docket no. 207). This ruling, which foreclosed plaintiff's last minute attempt to alter the evidence underlying its substantive claims, was affirmed by the District Judge (Docket no. 283) and the Fourth Circuit (Docket no. 308).

Similarly, plaintiff's attempt to offer questionable, deficient evidence to establish actual confusion again demonstrates the blatant lack of substantive merit to plaintiff's claims as the litigation progressed. As described in the court's summary judgment order, plaintiff's only evidence of actual confusion derived from: "(1) a comment by Robert Staher[sic]—a friend of plaintiff's founder and CEO, a trustee of plaintiff's stock option ownership plan, and a member of plaintiff's management team who admitted that he is not one of plaintiff's consumers—and (2) an unreliable likelihood-of-confusion survey that has been excluded pursuant to Rule 702, Fed. R. Evid., because the survey, *inter alia*, altered the parties' marks from how they appear in

10

commerce." (Docket no. 291 at 25–26). The court found that the law was abundantly clear: Mr. Starer's statements carried no weight, as they were statements made by plaintiff's associate who could not raise a genuine issue of confusion. (Docket no. 291 at 26 n.21).

In addition, plaintiff's survey evidence was found to be unreliable because the expert failed to conduct a proper survey, again demonstrating that plaintiff's claims lacked substantive merit. The defendants filed a detailed memorandum in support of the motion to exclude the reports, opinions, and testimony of Christopher F. Bonney explaining the many blatant flaws in the survey, his analysis, and his opinions. (Docket no. 173). Instead of recognizing the inadequacies of the report, plaintiff filed an opposition (Docket no. 209) requiring a reply (Docket no. 247) and argument. As discussed in detail in the court's memorandum opinion on defendants' motion to strike (Docket no. 289), the court found that plaintiff's expert was not qualified to present his proffered opinions and his conclusions based on the survey were so flawed as to be completely unhelpful to the trier of fact, and therefore inadmissible. (Docket no. 289 at 9). In making this ruling, the court found that: (1) while plaintiff's expert had four decades of experience as a market research consultant, plaintiff had not shown that he was qualified to opine on consumer confusion or proper survey methods in a trademark case; and (2) plaintiff's expert report was fundamentally flawed in a variety of ways. (Docket no. 289 at 10, 12). The court also noted that aside from his lack of basic knowledge regarding trademark infringement litigation, the expert deliberately altered defendants' marks to make them appear more similar to plaintiff's mark before asking questions regarding likelihood of confusion. (Docket no. 289 at 18). The alteration of the marks strongly suggests that plaintiff had doubts about the substantive merits of its claims.[3] The attempt to use a deeply flawed expert report was

---

[3] As the undersigned noted during the May 4, 2018 hearing, plaintiff was on notice of the insurmountable flaws in its expert report in defendants' motion to strike, which discussed the same issues on which the court later

compounded by a fact plaintiff was aware of from the very beginning of this litigation: plaintiff derived 99% of its revenue from its work for government clients, and performed 100% of its work through government contracts. (Docket no. 291 at 3). Moreover, plaintiff's consumers, namely NASA and the Department of Veteran Affairs, were especially sophisticated in making purchasing decisions based on detailed proposals and thorough bidding processes and were unlikely to mistake defendants' retail product for plaintiff's product. (Docket no. 291 at 28). Thus, plaintiff should have been aware that it could not establish a likelihood of confusion long before the briefing on summary judgment.

The remainder of the court's memorandum on summary judgment bolsters defendants' argument regarding the transparent weaknesses of plaintiff's claims. In deciding the first two counts against defendants for trademark infringement and unfair competition, the court found for defendants and against plaintiff on every prong of the likelihood-of-confusion inquiry, concluding that "the parties use their relatively weak 'VIVE' marks in different ways in disparate markets to promote dissimilar products." (Docket no. 291 at 11). In particular, the court found that the two "VIVE" marks were visibly distinct, and the record plainly showed from the very beginning that plaintiff's use of the mark—either as plain text or as its company logo—and defendants' use of the mark—next to stylized "HTC" and "StreamVR" marks with a neon blue triangle—were markedly different, weighing decisively against a finding of a likelihood of confusion. (Docket no. 291 at 16–17). Indeed, plaintiff struggled to produce admissible evidence demonstrating any possible confusion. Every additional prong demonstrates the stark differences between the marks and their uses in the commercial market. The court found that the parties distributed their products in entirely different ways (Docket no. 291 at 21), advertised in

---

ruled. (Docket no. 318 at 24:22–25). In response, plaintiff's counsel stated that despite knowing of the clear flaws in its survey, plaintiff hoped and believed that the survey would be accepted into evidence as factual statements. (Docket no. 318 at 25:1–14).

completely distinct markets (Docket no. 291 at 22–24), and were unlikely to confuse a sophisticated customer base. (Docket no. 291 at 27–29). There was no single element of the trademark infringement analysis that favored plaintiff, and nearly all of them *strongly* favored defendants. Similarly, there was no single factor of the ACPA analysis that favored plaintiff's claim, as the record was devoid of any evidence that defendants acted in bad faith. (Docket no. 291 at 30–31). Indeed, nearly all of the record evidence weighed in favor of defendants, aside from the excluded or discredited evidence plaintiff manufactured and attempted to introduce at the tail end of the litigation.

Plaintiff argues that it had an objectively reasonable case because the USPTO's legal experts determined multiple times that HTC Corp.'s use of the VIVE trademark would cause a likelihood of confusion. (Docket no. 312 at 16). Plaintiff reiterated this defense at the hearing on May 4, 2018, noting that the USPTO rejected HTC Corp.'s VIVE mark because it was in the same class as Valador's VIVE mark. (Docket no. 318 at 22:11–20). Plaintiff also stated that due to its belief that the litigation was initiated on a reasonable substantive basis, it continued to believe, even at the summary judgment stage, that its claims were not frivolous, and there remained a reasonable question for the jury. (Docket no. 318 at 25:16–26:7). Plaintiff's argument fails for several reasons. First, regardless of plaintiff's enduring subjective belief in its claims, it became *objectively* clear during the litigation that its claims were unreasonable. In fact, the District Judge made it clear to the plaintiff in the initial telephone conference on October 27, 2016 that the use of identical marks was not sufficient to support a claim for trademark infringement and it was imperative that there be a likelihood of confusion in the marketplace. (Docket no. 59). Second, even if plaintiff's claims originally had merit, it became clear that they were objectively unreasonable during discovery. Third, plaintiff should have

become aware as the litigation proceeded that the USPTO's findings "in terms of whether it grants or denies a trademark and whether it finds likelihood or says that there isn't any likelihood is not determinative, not controlling, not authoritative [in the district court]." (Docket no. 287 at 55:14–18). Furthermore, on January 18, 2017, the USPTO determined that the HTC Corporation's applications related to virtual reality hardware did not pose a likelihood of confusion with any existing registered trademarks and cleared the applications for publication. (Docket no. 291 at 5).

In sum, plaintiff's claims were objectively unreasonable, and plaintiff should have been aware that the substantive merits of its claims were tenuous at best as the litigation progressed. Instead of accepting the unmistakable fact that there was no viable argument that a consumer could be confused given the products at issue and the relevant marketplace for those products in existence at the time the action was filed, the plaintiff attempted to reinvent itself during the discovery phase in order to provide some basis for its ill-advised claims. Accordingly, based on the findings in the memorandum opinion granting the defendants' motion for summary judgment and the record in this case, the undersigned magistrate judge recommends a finding that plaintiff's claims lacked substantive merit, that the positions taken by the plaintiff in litigating this case were objectively unreasonable, and that this is an "exceptional" case on those grounds as defined by 15 U.S.C. § 1117(a).

2. Plaintiff's Litigation Conduct Was Unreasonable

Much of the discussion regarding the lack of substantive merit to plaintiff's claims discusses plaintiff's unreasonable litigation conduct. Under the *Georgia-Pacific* framework, a case may be considered "exceptional" when "the non-prevailing party has litigated the case in an unreasonable manner." *Georgia-Pacific*, 781 F.3d at 721.

From the beginning, plaintiff litigated this case in a manner that suggested, at best, a lack of serious deliberation. When plaintiff filed the original complaint on September 16, 2016, it also filed a contemporaneous motion for preliminary injunction, and set it for a hearing 14 days after the filing date. (Docket nos. 4, 6). On September 26, 2016, the court cancelled the hearing on plaintiff's motion, noting that plaintiff had yet to serve the complaint or the motion for preliminary injunction on defendants. (Docket no. 8). The day before the hearing date on plaintiff's amended motion for preliminary injunction, the court held a conference call in part because the parties were "proceeding in this case in a way that doesn't reflect . . . a clear understanding of typical procedures under Rule 65." (Docket no. 59 at 3:6–9). The court continued that having "charitably reviewed" plaintiff's motion, it construed the requested relief as a request for a temporary restraining order despite the lack of an explicitly request, or a citation to Federal Rule of Civil Procedure 65(b). (Docket no. 59 at 6:20–25). The court then noted that the hearing would be a "train wreck waiting to happen" given that neither party had sufficient record evidence prepared for the hearing. (Docket no. 59 at 15:4–11).

Following the pre-hearing conference, plaintiff's conduct demonstrated a disregard for the discovery process in this court. First, plaintiff filed initial disclosures on December 13, 2016 (Docket no. 75), a month and a half after the court set the schedule for the litigation (Docket no. 46), and only at the repeated prompting of defendants (Docket no. 139-4). Defendants also represent that plaintiff never provided them with trial exhibits, which plaintiff does not specifically deny. (Docket no. 303 at 20 n.7). Moreover, defendants represent that plaintiff failed to meet and confer prior to filing either of its motions to compel, instead filing a motion first and stating that it would withdraw the motion if the discovery dispute could be resolved. (Docket no. 256-1 at 3). Again, plaintiff does not specifically deny this conduct.

Plaintiff's cavalier approach was epitomized by the way it presented its ever-changing legal theory to defendants and the court. As discussed in detail with respect to the substantive merits of the litigation, plaintiff initially represented that its company "offers high level, complex technical and computer products and consulting services to governmental agencies and commercial enterprises, especially through 3D and virtual reality computer modeling and simulation solutions." (Docket no. 9, ¶ 1). As the case progressed, plaintiff altered its theory and claimed that it had "offered and continues to offer three dimensional virtual reality software to consumer oriented video game consumers" as of 2010. (Docket no. 177 at 5). Plaintiff went further, claiming that "more than 43,000 copies of Valador's 'Moundsville Slammer' video game software program" had been downloaded from the Internet. (Docket no. 177-1 at 3). Ultimately, discovery uncovered that the "Moundsville Slammer video game" was actually two maps created pursuant to a contract with Valve for Valve's video games. (Docket no. 291 at 4–5). Moreover, plaintiff was contractually prohibited from selling the Moundsville Slammer maps, and the maps were not branded with the "VIVE" mark. (Docket no. 291 at 5). Given the true nature of the Moundsville Slammer maps, it was unreasonable for plaintiff to represent that they were a stand-alone software program available for sale to consumers in its briefings and at hearings or that it had anything to do with the VIVE mark.

Plaintiff's discovery conduct became even more unreasonable when it made yet another abrupt strategic change and claimed that it was also selling a virtual reality headset. As discussed in detail above, plaintiff attempted to introduce evidence of the VIVE headset through belated productions on January 25, 2017 and February 1, 2017, two weeks before the deadline for discovery and the filing of dispositive motions. (Docket no. 148 at 12). Plaintiff also altered its website on February 3, 2017 to include an item regarding the "VIVE Virtual Reality Headset"

to reflect this new theory. (Docket no. 148 at 12).[4]  At the hearing on defendants' motion to preclude the admission of evidence regarding the headset, plaintiff's counsel effectively conceded that plaintiff had failed to fully answer an interrogatory regarding plaintiff's areas of business, instead repeatedly arguing that defendants were not unduly prejudiced by the belated disclosure. (Docket no. 243 at 21:18–23:5).  Taken together, plaintiff's belated disclosure appeared to be "knowingly too late" and suggests a lack of candor, either out of a misguided attempt at gamesmanship or due to plaintiff's awareness of the substantive weakness of its case. (Docket no. 243 at 55:1–18).

Plaintiff's mischaracterization of a significant witness in this case is yet another example of plaintiff's lack of candor during the litigation.  In its belated initial disclosures, plaintiff identified Robert L. Starer as an individual with discoverable information and stated that he could be contacted through plaintiff's counsel.  (Docket no. 75 at 3).  When defendants sought to subpoena Mr. Starer, plaintiff filed a motion to quash, claiming that Mr. Starer and his company, Historic Arms, were non-parties to the litigation and outside the jurisdiction of the court and could not be commanded to appear for a deposition in Washington, DC.  (Docket nos. 84, 85). Shortly thereafter, plaintiff withdrew the motion to quash.  (Docket no. 91).  Later, plaintiff's counsel characterized Mr. Starer as a trustee for Valador's stock option ownership plan in seeking to shield documents from production under the attorney-client privilege.  (Docket no. 243 at 61:16–19).  Plaintiff's counsel also confirmed that in his capacity as a trustee, Mr. Starer had full access to all of Valador's corporate records and was one of three individuals who controlled how the company operated.  (Docket no. 243 at 68:15–23).

---

[4] Plaintiff also altered its website after filing this lawsuit to prominently feature the unstylized, hyperlinked word "VIVE" on its main page for the first time.  (Docket no. 291 at 5).

As the court noted during that hearing, plaintiff's re-characterization of Mr. Starer was troubling not merely because it forced defendants to use the subpoena process, but also because Mr. Starer was plaintiff's sole witness for third-party confusion. (Docket no. 243 at 69:7–13). Indeed, Mr. Starer was a "plaintiff-insider who happens to be the CEO's friend (but has never been one of plaintiff's consumers)," a fact which became clear only through additional discovery. (Docket no. 291 at 26). Moreover, Mr. Starer was involved with the approval of the original cease and desist letter sent by plaintiff to defendants. (Docket no. 287 at 16:21–17:2). Plaintiff confirmed this understanding of Mr. Starer's true role at the May 4, 2018 hearing, arguing that despite belatedly disclosing Mr. Starer's role as a trustee shareholder, plaintiff had not concealed his true identity. (Docket no. 318 at 23:13–24:3). Plaintiff's argument lacks merit: Valador misrepresented Mr. Starer as a knowledgeable third-party rather than a plaintiff-insider and active participant in the litigation, forcing defendants to engage in the subpoena process and misleading the court about the substantive merits of its actual confusion claim.

Finally, defendants also allege that plaintiff failed to comply with two of this court's orders on defendants' motions to compel. (Docket no. 303 at 17). With respect to defendants' first motion to compel (Docket no. 112), the court ordered plaintiff to provide: documents responsive to certain requests for production by February 1, 2017 (Docket no. 135 at 5:2–6:16);[5] a copy of plaintiff's stand-alone VIVE software (Docket no. 135 at 9:23–10:11); a supplemental privilege log (Docket no. 135 at 11:21–12:2); and supplemental responses to several interrogatories (Docket no. 135 at 19:19–23:6). With respect to defendants' second motion to compel (Docket no. 138), the court ordered plaintiff to provide: relevant documents it received from a third-party subpoena (Docket no. 243 at 57:24–58:13), metadata on specifically identified

---

[5] The court also specifically stated that if plaintiff again represented that it had no responsive documents to produce but then provided additional documents responsive to those requests thereafter, that there would be "serious consequences." (Docket no. 135 at 5:14–23).

documents (Docket no. 243 at 59:20–60:1), and certain documents that plaintiff had claimed were privileged (Docket no. 266 at 17:2–8). Defendants represent that plaintiff failed to comply with these orders by failing to: (1) produce a copy of the stand-alone VIVE software, (2) verify its interrogatory responses, (3) provide metadata for specific documents, and (4) provide attachments to certain emails. (Docket no. 303 at 17–18). Plaintiff only briefly refuted defendants' claims, stating that it supplemented its document production as ordered by the court but never contesting that it did not provide the defendants with a copy of the VIVE software that plaintiff initially claimed was its VIVE branded product. (Docket no. 312 at 16).

While plaintiff's failure to follow this court's orders is not dispositive to this motion, plaintiff's representations are troubling and fit into the broader pattern of behavior discussed above. At the hearing on May 4, 2018, plaintiff argued that its litigation conduct was not unreasonable because it also had to file motions to compel, and parts of defendants' discovery motions were unsuccessful. (Docket no. 318 at 29:22–30:22). However, this argument conflates the legal merits of individual motions with a course of conduct throughout the litigation that suggested an indifference towards the rules of this court. Plaintiff's conduct, considered in its entirety, exemplifies unreasonable litigation conduct. This unreasonable litigation conduct is shown not just in asserting claims long after they should have abandoned, but in do so by failing to comply with the court's rules and orders and the litigation-driven attempt to support its claims through changes allegedly made to plaintiff's business model after the litigation was initiated. Accordingly, the undersigned magistrate judge recommends a finding that plaintiff litigated this case in an unreasonable manner, and that this is an "exceptional" case on those grounds as well as the grounds of pursuing objectively unreasonable claims as defined by 15 U.S.C. § 1117(a).

## Relief

Defendants have submitted documentation in support of their request for attorney fees (Docket nos. 302–03), as well as a bill of costs (Docket no. 298). For the reasons stated below, the undersigned recommends awarding the defendants the entire $1,502,909.95 in fees and $29,852.28 in costs that have been requested.

1. Attorney Fees[6]

Where an award of fees is appropriate, the Fourth Circuit has set forth the standard for determining whether fee awards are reasonable in *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235 (4th Cir. 2009). In *Robinson*, the Fourth Circuit directed that "[i]n calculating an award of attorney's fees, a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Id.* at 243 (citing *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008)). The Fourth Circuit next instructed that "[i]n deciding what constitutes a 'reasonable' number of hours and rate," the court should be guided by the following twelve factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 243–44 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974),

---

[6] As noted by the court in an earlier action, "it is important to remember that '[a] request for attorney's fees should not result in a second major litigation.'" *Synthon IP, Inc. v. Pfizer Inc.*, 484 F. Supp. 2d 437, 444 (E.D. Va. 2007) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)), *aff'd* 281 F. App'x 995 (Fed. Cir. 2008).

*abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989))).  In *Plyler v. Evatt*,

the Fourth Circuit noted that "[i]n addition to the attorney's own affidavits, the fee applicant

must produce satisfactory specific evidence of the prevailing market rates in the relevant

community for the type of work for which he seeks an award." *Plyler v. Evatt*, 902 F.2d 273,

277 (4th Cir. 1990) (internal quotation marks and citation omitted).  Once the court determines

the lodestar figure, the court should subtract fees for hours spent on unsuccessful claims, and

then "award[] some percentage of the remaining amount, depending on the degree of success

enjoyed by the plaintiff." *Robinson*, 560 F.3d at 244 (internal quotation marks and citation

omitted).

As an initial matter, in its supplemental reply, plaintiff argues that the court should not

"reconsider its prior rulings," referencing the instances where the court declined to award

attorney's fees or costs to either party in the course of motions practice during discovery.

(Docket no. 316 at 3).  As the undersigned noted during the hearing, the court's decision not to

award attorney's fees or costs at the motions stage does not preclude the court from awarding

attorney's fees for the entire litigation.  (Docket no. 318 at 32:6–20).

Defendants seek $1,502,909.95 in attorney fees.  (Docket no. 302).  The attorney fees

figure is comprised of 645.65 hours worked by Salsabil Ahmed, 914.9 hours worked by David J.

Ball, 892.6 hours worked by Timothy R. Geiger, 262.1 hours worked by Erin S. Hennessy, 468.3

hours worked by Melissa A. Morgan, 499.2 hours worked by Ben Ruzow, and 469.7 hours

worked by Doug Stewart, with a 617.7 hour reduction applied, for a total of 3,534.75 hours

worked.  (Docket no. 303 at 26).

In support of the reasonableness of these fees, defendants submitted a declaration from

Bernard J. DiMuro (Docket no. 303-12) ("DiMuro Decl."), a senior partner at DiMuroGinsberg,

PC in Alexandria, Virginia. Mr. DiMuro indicates that he has been licensed to practice in Virginia since 1979, has practiced extensively in federal courts in Alexandria, Virginia and elsewhere, and has represented clients in a variety of complex cases, including actions for trademark infringement arising under the Lanham Act and cybersquatting. (DiMuro Decl. ¶¶ 1–3). Mr. DiMuro indicates that he is familiar with the prevailing market rates for attorneys in Northern Virginia in both large and small firms, and has reviewed the rates charged by attorneys from Bracewell LLP, ranging from $500.00 per hour for partners to $325.00 per hour for associates. (DiMuro Decl. ¶¶ 5–6). Having reviewed those rates and the biographies of the attorneys who worked on the case, Mr. DiMuro submits that the $500.00 per hour rate for partners and the $325.00 per hour rate for associates are well within the prevailing market rates for intellectual property litigation attorneys of similar education, training, and experience employed by similar firms in Northern Virginia. (DiMuro Decl. ¶ 6).

Defendants also submitted a declaration from Douglas F. Stewart (Docket no. 303-11) ("Stewart Decl."), a partner at Bracewell LLP and co-lead counsel in this litigation, which indicates that the billing records attached to his declaration (Docket no. 303-11 at 15–212), detailing the time spent on specific tasks in this litigation, are accurate, and second, that based on his years of practice in intellectual property litigation, the billing rates charged by the attorneys in this matter are reasonable and appropriate for the services rendered in this litigation. (Stewart Decl. ¶¶ 2, 38–39).

The undersigned has reviewed the materials submitted in support of defendants' motion for attorney fees and now considers the reasonableness of defendants' attorney fees request in light of the *Barber* factors. First, the undersigned recommends a finding that *Barber* factors one, two, three, seven, and eight support a finding that the number of hours spent and tasks performed

by defendants' counsel was reasonable. The time records submitted by defendants (Docket no. 303-11 at 15–212) demonstrate that defendants' counsel spent a reasonable amount of time litigating the case given the numerous claims in this action, the pace at which litigation progressed, the compressed timeline of the litigation, the timing of the litigation, and defendants' award of summary judgment on the pertinent counts.

With respect to the first, second, and third factors, the issues arising from plaintiff's trademark infringement claims were moderately complex, and the discovery and motions practice required to litigate the case demanded significant skill on the part of the attorneys. Moreover, defendants have provided substantial evidence in support of the claimed time and labor expended in the form of task-by-task breakdowns of every billed item since the beginning of the litigation, providing the requisite records such that "a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed." *Two Men and A Truck/Intern., Inc. v. A Mover Inc.*, 128 F. Supp. 3d 919, 925 (E.D. Va. 2015) (citing *Hensley v. Eckherhart*, 461 U.S. 424, 441 (1983) (Burger, C.J., concurring)). A review of those records indicates a judicious approach was undertaken by defendants' counsel in litigating this action.

With respect to the seventh and eighth factors, plaintiff sought to enjoin HTC from use of the HTC Vive brand name after HTC had already invested to advertise and promote its product during the critical fourth quarter holiday sales period. (Docket no. 303 at 25–26). The requested relief would likely have resulted in severe monetary losses and significantly impaired HTC's ability to compete in the emerging virtual reality hardware market. (Docket no. 303 at 26). In addition, this case was litigated on an aggressive schedule, with three and a half months of discovery and summary judgment argued four days prior to the original trial date. (Docket no.

46).  As a result, defendants were required to fully prepare their case for trial before defendants could be heard on their motion for summary judgment.  (Docket no. 303 at 29).  Moreover, this case required engaging in significant motions practice, including several discovery motions, motions to dismiss, pretrial motions, and motions for summary judgment along with plaintiff's motion for preliminary injunction.  (*See, e.g.,* Docket nos. 10, 24, 48, 51, 54, 106, 112, 138, 152, 159, 164, 172, 175, 179, 211, 214, 216).  Defendants also allege that plaintiff's unreasonable litigation conduct, discussed in detail above, exacerbated the costs of litigation by forcing defendants to engage in renewed discovery as plaintiff fundamentally altered its legal strategy or otherwise failed to comply with its discovery obligations.  (Docket no. 303 at 27–28).  A review of defendants' billing records substantiates this claim.  In addition, defendants applied a reduction of $130,877.30 representing 617.7 hours of work, including a 50% reduction on defendants' motions to dismiss the first and second amended complaints because they included work related to plaintiff's state law conspiracy claims, and for fees incurred in connection with third-party discovery which was ultimately not used by defendants.  (Stewart Decl. ¶¶ 32–34).[7]

Plaintiff's opposition asserts a generic argument that the sheer number of hours billed—over 4,000 hours of work over the course of 166 days—suggests that defendants' counsel fees are either unreasonable or that defendants' counsel worked in an inefficient and costly manner.  (Docket no. 312 at 18–19).  However, in making this claim plaintiff does not specifically cite any portion of the billing records provided in support of the motion, and a review of the billing records confirms that plaintiff's argument lacks merit.  Accordingly, the undersigned recommends a finding that the first, second, third, seventh, and eighth *Barber* factors support a finding that the number of hours billed in this matter was reasonable.

---

[7] Defendants also note that they excluded fees for: work done after the summary judgment hearing on March 3, 2017; and twelve individuals who did not bill more than 250 hours or $100,000 in this case for a total of 717.8 hours billed and $242,694.00.  (Stewart Decl. ¶¶ 22–27).

Second, the undersigned considered the materials submitted by defendants in support of a finding that counsel's hourly rates in this matter were reasonable under the fifth, ninth, eleventh, and twelfth *Barber* factors. (*See* DiMuro Decl. ¶ 6; Docket no. 303-11 at 213–27). The undersigned recommends a finding that these submissions substantially comply with the standards set forth in *Grissom*, 549 F.3d at 320–23, *Plyler*, 902 F.2d at 277, and *Barber*, 577 F.2d at 226 for establishing a reasonable fee award. Pursuant to the Fourth Circuit's direction, defendants must submit evidence that the hourly rate sought for their attorneys "coincide[s] with the then prevailing market rates of attorneys in the Eastern District of Virginia of similar skill and for similar work." *Grissom*, 549 F.3d at 323. Aside from Mr. DiMuro's declaration, defendants have provided biographies of their attorneys to establish their significant experience with the subject matter of this litigation. (Docket no. 303-11 at 213–27). For example, Ms. Hennessy had 20 years of experience as an attorney at the time of the litigation and is the head of Bracewell LLP's Trademark and Copyright practice (Stewart Decl. ¶ 39, Docket no. 303-11 at 216–17), while Mr. Stewart had 13 years of experience as an attorney and has experience litigating all aspects of intellectual property and technology (Stewart Decl. ¶ 39, Docket no. 303-11 at 214–15). In addition, counsel provided a 10–35% discount on its hourly rates for partners and a 25–35% discount on its hourly rate charged for associates. (Stewart Decl. ¶ 38). With the reductions applied, the four associates on the core litigation team—Salsabil Ahmed, Timothy R. Geiger, Melissa A. Morgan, and Ben. Ruzow—charged $325 per hour, while the partners on the core litigation team—David J. Ball, Erin S. Hennessy, and Doug Stewart—charged either $485 or $500 per hour. The hourly rates charged by counsel are consistent with the hourly rates incurred in similar cases and awarded by this court. *See Taylor v. Republic Services, Inc.*, 2014 WL 325169, at *5 (E.D. Va. Jan. 29, 2014) (finding that as of 2011, hourly rates of $250–435

25

were appropriate for an attorney with 1–3 years of experience, $350–600 for 4–6 years, $465–640 for 8–10 years, $520–770 for 11–19 years, and $505–820 for 20+ years). Therefore, the undersigned recommends a finding that the fifth, ninth, and twelfth *Barber* factors support a finding that the hourly rates charged by defendants' counsel in this matter were reasonable.

Having analyzed the twelve factors set forth in *Barber* and *Robinson*, the undersigned recommends a finding that the 3,534.75 hours spent by defendants' counsel in litigating this action is reasonable. The undersigned also recommends a finding that the $325 per hour rate charged by associates and the $485 or $500 per hour rates charged by partners were reasonable and commensurate with rates charged by others with like experience for like matters in the Northern Virginia legal community. As such, the undersigned recommends that the court adopt $1,502,909.95 as the lodestar figure.

According to the analysis set forth in *Robinson*, a court must next subtract fees for time spent "on unsuccessful claims unrelated to successful ones." *Robinson*, 560 F.3d at 244. At the summary judgment stage, defendants prevailed on the three remaining claims. Defendants explicitly excluded fees pertaining to plaintiff's state law conspiracy claims by applying a 50% reduction to the fees incurred in defending against those claims at the motion to dismiss stage and has excluded fees for non-core team attorneys. (Stewart Decl. ¶ 32). Therefore, the undersigned does not recommend a further reduction to the lodestar figure.

2. Bill of Costs

"Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). While the Lanham Act does not explicitly allow for an award of costs to prevailing defendants, the Fourth Circuit has held that Rule 54(d)(1) creates the presumption that costs are to be awarded to the prevailing part. *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999).

Pursuant to 28 U.S.C. § 1920, "[a] judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

Defendants filed their bill of costs on March 28, 2017 (Docket no. 298), shortly after the Clerk of Court entered judgment for defendants and against plaintiff (Docket no. 295). Plaintiff has not opposed defendants' bill of costs. Defendants' bill of costs, totaling $29,852.28, seeks: (1) $21,434.10 for fees for printed or electronically recorded transcripts necessarily obtained for use in this case, (2) $441.94 in fees for witnesses, and (3) $7,956.24 in fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in this case. (Docket no. 298 at 1). The exhibits to defendants' bill of costs contain a further itemization of the costs incurred in obtaining transcripts, witness expenses, and fees for printing/reproduction and docket fees. (Docket nos. 298-1, 298-2, 298-3, 298-4, 298-5).

A review of defendants' bill of costs reveals that the costs sought are within the categories enumerated in 28 U.S.C. § 1920. Moreover, given that plaintiff has not objected to the reasonableness of these costs, the undersigned recommends awarding defendants $29,852.28 in costs.

## Conclusion

For these reasons, the undersigned magistrate judge recommends a finding that the $1,502,909.95 requested for attorney fees and the $29,852.28 requested in costs by defendants are reasonable and should be awarded.

## Notice

By means of the court's electronic filing system the parties are notified that objections to this proposed findings of fact and recommendations must be filed within fourteen (14) days of service of this proposed findings of fact and recommendations and a failure to file timely objections waives appellate review of the substance of the proposed findings of fact and recommendations and waives appellate review of any judgment or decision based on this proposed findings of fact and recommendations.

ENTERED this 30 day of May, 2018.

_____ /s/ _____
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

28